## CHARLESTON

### AMMONS v. TOOTHMAN.

Submitted January 16, 1906.    Decided February 27, 1906.

1. MINES AND MINERALS—*Deed to Oil—Exception in Deed.*

   A deed conveys oil in land "except a well now producing oil." That well ceasing to produce oil is deepened by the lessee to a different sand rock, and produces oil from it. The exception excepts from the operation of the deed the oil produced from the lower sand rock. (p. 167.)

(Cox, JUDGE, Absent.)

Appeal from Circuit Court, Monongalia County.

Bill by Corbly A. Ammons against Charlotte Toothman and others. Decree for defendants, and plaintiff appeals.

*Affirmed.*

GEO. C. BAKER, for appellant.

MORELAND & GLASSCOCK and CHAS. POWELL, for appellees.

BRANNON, JUDGE:

William R. Shuman and wife owning a tract of land made a lease of it for the production of oil and gas, which lease

came by assignment to the South Penn Oil Company. The lease provided for payment to Shuman of one-eighth of the oil as royalty. Shuman sold half of this eighth of the oil and died owning the other half of the eighth. Under this lease the South Penn Company drilled two wells on the land, one unproductive, the other productive out of what is called the Big Indian sand. This well was 1,900 feet deep, and produced oil in payng quantity. This well was called Well No. 1. On the death of William Shuman and Minerva Shuman, his wife, said half of said eighth oil royalty payable to them under said lease went to three heirs, one of them being Charlotte Toothman. The said tract of land was divided between the three heirs, Charlotte Toothman getting for her share a tract of fifty-seven acres and a fraction; but the oil was not divided, but left in common for the three heirs, the three heirs owning the said half of one-eighth royalty in common. The said producing well was on Charlotte Toothman's separate tract, though the oil therefrom belonged to all three heirs. Charlotte Toothman and her husband made a deed, 6th December, 1897, to Corbly Ammons and Isaac Ammons conveying the said tract of fifty-seven acres in fee, and also conveying one-half of the oil and gas owned by Charlotte Toothman in the entire lands which had been owned by her father and mother, William R. and Minerva Shuman, "except the well that is now producing oil on said land." The language of the deed as to this is as follows: "The second partys is to have one-half of the oil and gas that may hereafter be produced under the land that belonged to Minerva Shuman and William R. Shuman, and the first party reserves the one-half of said oil and gas. This deed means ½ half of the first party interest in said oil & gas, except the well that is now producing oil, on said land." At the time the deed was made said Well No. 1 was producing oil from the Big Indian sand in paying quantity, but later it ceased to produce oil in paying quantity, and the lessee, the South Penn Company, drilled said well from 1,000 to 1,100 feet deeper, down to a lower and different sand rock stratum from the Big Indian, abandoning the latter sand rock. The deeper sand rock or stratum being known as the Fifth sand rock, not known to be an oil producing stratum at the date of the deed, as no wells in that section

of the country had then been drilled to that sand or stratum. Said well on reaching that deeper stratum found oil in paying quantity. The South Penn Oil Company produced oil from this lower stratum and recognized Charlotte Toothman as owning her full share in the oil produced from said lower stratum and delivered it to her credit to the Eureka Pipe Line Company for transportation, and did not recognize Ammons as having any interest in the oil from that well. Isaac Ammons having sold his interest to Corbly Ammons, the latter brought a suit in equity in Monongalia county against Charlotte Toothman and said two companies for discovery and account for the oil produced from said Fifth sand through Well No. 1, and to have a decree against those liable therefor, and to have a decree declaring him entitled to half the share of oil of Charlotte Toothman produced, or to be produced, through said well from said Fifth sand, the bill thus claiming that the deed from Toothman to Ammons reserves only the Toothman share produced from the Big Indian sand and excepted no oil in the lower sand, but that Ammons was entitled to half of that oil. The court sustained a demurrer to the bill as to this claim of Ammons, and he appealed.

The question is, Does that deed convey to Ammons the half of Mrs. Toothman's share of oil coming from the lower sand rock, or does it except the oil produced from that rock through said well, and exclude Ammons from any interest in that oil? The main argument for the position that the deed confers half of Toothman's interest in the oil from the lower sand rock is, that when the well ceased to produce oil it was an abandoned well, it became a dry hole, and that Toothman's estate in it ceased, and she no longer had any estate in it. For this position the case of *Steelsmith* v. *Gartlan*, 45 W. Va. 27, is relied upon, because of its holding "The completion of a non-productive well, though at great expense, vests no title in the lessee." That case refers to the lease. It means that if, under the usual oil lease, a non-productive well is drilled and abandoned, no estate vests in the lessee. That is not the question or test here. No one can claim that under such lease, if the lessee go on in further exploration, his right is lost. He may go on in a reasonable time. But that is not the question here, because when that well

produced oil in paying quantity from the upper sand, an estate vested in the South Penn Company and remained vested in it. The bill admits that that well produced oil in paying quantity. Therefore, an actual estate vested in the lessee, and though that well ceased to produce oil from the upper sand, the lessee had an estate still under which it had right to go on lower with the well, and did so. The lessee's right was not lost or abandoned, and neither was Mrs. Toothman's right gone. The lessee chose to retain its estate and well by sinking that well deeper, and its right continued and so did the right of Mrs. Toothman. Her right depended on the right of the South Penn Oil Company, followed it, and was measured by it. As long as that Well No. 1 was a well for the lessee, it was also a well for Mrs. Toothman. That well was not abandoned by the company. But the argument is, not that the lease failed, but that the company abandoned the *upper sand;* it did not abandon the lease or lose its estate under the lease, but the claim is, that the company abandoned that well so far as the upper sand was concerned. In other words, it claimed that it abandoned that well. This is a very refined argument—very technical. It is argued that when sunk to a lower sand, a quick change was wrought in that well and it became a *new* well, another and different well from what it had been. This is a very refined and technical argument. It is not a new well, not a different well, in any sense; it is only a deeper well. The 1,900 feet which had been bored remained still a part of that well, its greater part. The hole was the same hole in the ground; its identity was not gone. The mouth of the well from which the oil issued was the same. The oil from the lower sand came through that 1,900 feet and issued from the mouth of the well, from the Fifth sand, just as it had from the Big Indian sand. The 1,900 foot depth and the mouth of the well were used and utilized in the production of the oil from the lower sand. What if the oil came from the lower sand? It came through the 1,900 feet, and issued from the old orifice. I cannot see that the identity of the well was lost. A well remains the same well though continued down into the earth deeper. To say that Toothman was tied down by the exception in the deed to oil coming from the Big Indian sand is unreasonable. Where is the language

in the deed that does this? The sinking of the well lower was an eventuality or a contingency not unlikely to occur, and we may say might be regarded as probable. Oil wells are often sunk deeper. The claim is that Mrs. Toothman in that exception in her deed had her mind only on oil produced from the upper sand, and intended to except only that. Where are the words to speak that intent? The exception is of that well, meaning all oil produced through it, and Ammons was excluded from ownership in that well. The plain intent was to exclude him from any interest in oil produced from that well, come from where it might in the future. Mrs. Toothman may fairly be said to have intended to retain her interest in all oil coming through that well so long as the lessee should operate it by producing oil through it, in whatever manner the lessee might operate that well. There was the lessee actually operating the well at the date of the deed, and to whatever depth the lessee might sink that well, to that depth also the exception in the deed must go. Did the parties mean anything else? In the first place, here is a broad exception of that well, excluding Ammons from oil produced in it. It is an exception not merely a reservation. Strictly speaking an exception keeps the deed from passing the thing excepted, a reservation reserves something out of the thing granted. Mrs. Toothman never granted oil in, or to come through, that well. That exception means that the deed was not intended to confer on Ammons any right at all as to that well or its product. I say there is that broad language. Such are the words of the deed speaking the intent under all circumstances. But suppose we seek probable intent outside the words. Suppose Mrs. Toothman had been told that the deed would except only the oil from the upper sand. Do you think she would have agreed to it? Suppose she had been told that if the lessee should bore lower and get a rich stream of oil from a rich sand rock, she would have no interest in it. Think you she would have agreed to it? Did either side mean it? And yet great stress is laid in argument upon a supposed intent to limit the exception to the Big Indian sand, and to make the deed pass to Ammons from the Fifth sand. I say the inference is very strong against any such intent. If we grope about for intent outside the words of the deed, it is much more reasonable to say that Mrs.

Toothman intended to retain all her oil in that well, come from what depth it might, than to limit herself to one sand rock and give to Ammons all oil below it. The deed does not mention any sand rock. To say that it refers to only one is going outside the deed and making the deed do what its words do not do. I would emphasize the fact as important that when that deed was made the well was in actual operation producing oil, with a vested estate in the lessee to continue that well to a lower depth, and as Mrs. Toothman excepted that well her right was co-equal with that of the lessee and followed the lessee's right as long as it existed. It was not a new well to the lessee, neither was it a new well as between Mrs. Toothman and Ammons. A lease in 1831 was made to mine coal in lands. Under it two seams were opened and mined. In 1834 a will gave the widow of the lessor "rents, issues and yearly proceeds for life" in the lands. In 1856 the lease being nearly expired and the coal in the two seams which had been worked becoming exhausted, a new lease was made, and under it the mine was sunk to another seam of coal, the Brockwell seam, at a depth of 118 fathoms below the seam which had been opened. That seam was utterly unknown until 1846. The question was, did the widow have right, as life tenant, in that lower seam of coal under the rule that a life tenant can work to exhaustion on a coal mine *opened* when the life estate vests. It was claimed, as in this case, that this different seam of coal far below the upper ones was a new mine, not one opened at the date of the commencement of the life estate. The widow was held entitled to the rents of the lower vein, because the deeper excavation was only a continuance of the old mine. The opinion says: "I am clear that this is the old mine; *Clavering* v. *Clavering*, (*a*), did not confine the right to one seam. If there be one shaft by which you can work five seams, and which are all let, but only one is worked at first, I am of opinion, that when the lease begins to work the other seams it cannot be said to be opening a new mine, I have no doubt that it is substantially and practically the old mine. I agree, that if a man has opened a shaft for winning coal, and he finds in another part of his estate mines of lead or ironstone, which could not be got by means of the old shaft or opening, this would be opening a new mine; but here the lessees were at

liberty to open other shafts, and to work all coal and iron-stone, and I think that this is only a repetition of the working of the old mine." *Spencer* v. *Scurr*, 31 Beavan's Rep. p. 337. Just so in this case. Here the South Penn had bored to a certain stratum or seam at the date of this exception. It went on down to another stratum and the rights of Mrs. Toothman went with the South Penn's rights into the lower oil stratum. Mrs. Toothman intended to keep to herself all of her share of the oil produced in that well then being worked by the lessee, and neither of the parties contemplated that her right should stop at the Big Indian sand. No such idea was in their heads. The deed does not do so.

I cite *Couch* v. *Puryear*, 1 Randolph 258, not as conclusive, but as *leaning* in favor of the position above taken. The syllabus says the life tenant may sink new shafts into the same veins of coal, and that he may go through a seam already opened, and dig into a seam that lies under the first. The seams were separated by slate. How thick does the slate have to be to make it another vein? Certainly the case goes that far. But the answer set up right under the life tenant "to sink new shafts and pursue the coal in every direction and to every extent they may think proper to obtain the coal." The answer claimed that all the coal in the land was part of the same mine. The attorneys argued that the word *mine* "included the whole mass or vein of coal contained within the land." The court simply dissolved the injunction specifying no reason. So, we may say the court took this view. The syllabus was not prepared by the court. If there be a shaft into a vein of coal, and the life tenant exhaust it, must he do without coal when by extending his shaft to a lower vein he can get it? The words "the well now producing oil" are not descriptive of the oil; they do not merely mean the oil now being produced; they do not describe the oil to be produced from any particular sand; but they were used to describe and identify the well. They were intended to excluded Ammons from a particular well.

Decree affirmed.

*Affirmed.*