Dougherty, Trustee, et al., *v.* Thomas, Executor, Appellant.

Argued October 3, 1933. Before FRAZER, C. J., SIMP-
SON, SCHAFFER, MAXEY, DREW and LINN, JJ.

*J. C. Davies* and *P. J. Shettig*, of *Shettig & Nelson*,
with them *H. S. Endsley*, for appellant.

*A. Evans Kephart* and *P. J. Little*, for appellees.

OPINION BY MR. JUSTICE MAXEY, November 27, 1933:
This is an appeal from a judgment for $12,457, in-
clusive of interest, recovered by plaintiff in an action
of assumpsit based on a claim for royalties accruing for
seventeen years under a lease of a seam of coal. The
divers rights of the parties to the lease have distribu-
tively passed by operation of law to "plaintiff" and "de-
fendant"—which nomenclature as herein used shall be
deemed inclusive of the parties' respective predecessors
in title.

The following defenses to plaintiff's claim are before
us for consideration: (1) Exclusive possession of the
leased seam of coal was not delivered to defendant due
to a paramount outstanding title in another.

(2) Since for a period of seventeen years after the
date of the lease neither the lessors nor their agent made

any demand that lessee should comply with the covenants respecting the coal and pay the stipulated royalty, there is a presumption of waiver of royalties and the lessor is estopped from now demanding payment.

(3) Since the coal lease contemplated the existence of mineable and merchantable coal and defendant's evidence shows the coal is not merchantable in a commercial sense, there is a failure of consideration.

In Dean Township, Cambria County, there is a 300-acre tract of land containing a seam of flint fire clay and above this clay seam a seam of coal. On and prior to August 4, 1905, the surface of this land and the fire clay below the surface and an undivided one-half of the coal underlying the land were owned by John H. Dougherty et al., and the other undivided one-half of the coal was owned by Annie C. McCurdy and Wright McEnally. On that date articles of agreement were entered into between the owners of the fire clay and James P. Thomas, trustee, conveying to the latter the exclusive right to mine and remove the fire clay. This lease was for a term of fifteen years from August 1, 1905, and for an additional five years at the option of the lessee. The royalty was 15 cents per gross ton and the minimum to be mined was 7,000 tons per year. In a supplemental agreement the lessors assented to the subletting of the lease to A. J. Haws & Sons, Ltd., a limited partnership association, and pursuant thereto James P. Thomas, trustee, on April 4, 1906, sublet at 35c a ton the seam of fire clay to A. J. Haws & Sons, Ltd., for the balance of the entire term. This sublease was in turn assigned by A. J. Haws & Sons, Ltd., to Harry L. Tredennick on February 7, 1917, pending the incorporation of Haws Refractories Company. On February 17, 1917, the lease was assigned by Harry L. Tredennick to Haws Refractories Company, which company acquired by purchase all the holdings of A. J. Haws & Sons, Ltd., and the latter organization was dissolved.

A. J. Haws & Sons, Ltd., from 1906 until 1917 conducted all operations in plaintiff's lands. In the latter part of 1912 or the early part of 1913, A. J. Haws & Sons, Ltd., encountered a rock formation or "fault" in the fire clay bed. Bore holes revealed that this "fault" extended a distance of 2,475 feet, at which point there was another large clay bed. It was also discovered that about eight to ten feet above this "fault," there was a vein of coal known as the "A" seam, approximately three feet in thickness. On account of the expense of constructing a tunnel through the "fault," good engineering suggested that a tunnel or passageway be driven from one bed of clay to the other through the seam of coal overlying the "fault," and that top and bottom rock therein be removed to provide additional height. On January 1, 1913, the coal lease giving rise to this controversy was executed. The lessors were the owners of the clay beds and surface *and also* Annie C. McCurdy and Wright McEnally, who owned no interest in the clay beds but did own an undivided one-half interest in the coal. James P. Thomas, trustee, was the lessee and the lease gave him the sole right to mine the "A" seam of coal underlying the 300 acres of land and overlying the clay leased in 1905 (whom Thomas was trustee for does not appear and is not material). Its term was twenty years with the privilege of extending the term for a further period of ten years at the option of the party of the second part. Among the "rights and privileges" granted Thomas were the following: "III. The party of the second part shall have the right, at any and all times hereafter to haul coal and fire clay from other lands through the openings and headings made in the land hereby leased." Thomas agreed that quarterly returns of all coal mined would be made to the agent, and that the latter would be paid a royalty of eight cents per ton. Thomas further agreed that he would mine and remove not less than 5,000 tons of coal from the premises per annum during the continuance of the lease and pay

the royalty prescribed "whether [5,000 tons was] mined or not." Clause VI of the lease provided "that if the merchantable and mineable coal in said seam shall be exhausted before the expiration of the period or periods herein fixed, then in such event the party of the second part may surrender this lease and thereupon all his rights, and privileges, as well as all his liabilities and obligations hereunder shall cease and determine."

At the same time a new lease was prepared for the fire clay in this tract whereby the owners re-leased the clay to James P. Thomas, trustee, upon practically the same terms and conditions as the former lease as to minimum tonnage and the amount of royalty to be paid, namely, seven thousand tons at fifteen cents per gross ton. The new clay lease bore the same date as the coal lease, January 1, 1913, and was to extend for a period of twenty years from that date with the privilege of extending the term for a further period of ten years by giving ninety days' notice, etc. The coal lease and the new clay lease were both recorded September 1, 1913.

Shortly after the execution and delivery of the coal lease, A. J. Haws & Sons, Ltd., obtained possession of the coal property leased to James P. Thomas, and began mining the coal. Haws & Sons were succeeded by the Haws Refractories Company, and the latter by the Johnstown Mining Corporation. A. J. Haws & Sons, Ltd., drove a tunnel and airway through the coal a distance of over 2,400 feet to the second bed of fire clay. Five thousand tons of coal were removed, some of it being given to employees of Haws & Sons and some of it was sold at a cheap price to the owners of a calcium plant. No royalty was paid for it. No other coal has been mined from the "A" seam in this tract as experience proved that it was not merchantable. Thomas did not assign the coal lease to A. J. Haws & Sons, Ltd., but he was the general manager of Haws & Sons while the tunnel was being driven partly through the coal, i. e., until June, 1914. Since 1918 clay mining operations in

this tract have been conducted by the Johnstown Mining Corporation.

Defense No. 1 is based on the theory that on January 1, 1913, Haws & Sons, successors (as sublessees) of Thomas' rights in the clay lease, had the same right to make a passageway in the "A" seam of coal, as the 1913 coal lease expressly gave Thomas, and therefore the plaintiff granted in the coal lease something he did not possess.

This theory is untenable. The clay lease gave the lessee the following rights in the entire tract of 300 acres: (1) the right "to explore, mine and dig for fire clay......*in, upon and under* the surface of the tract." (2) The right "to take, remove and transport" fire clay from the tract and *for that purpose* "to construct and build roads, railroads or other works *upon* said lands necessary for the mining *upon* the same." Lessee's right to explore, mine and dig for fire clay specified it to be *"in, upon and under* the surface of the tract," whereas for the purpose of transporting the fire clay he was given the right to build roads only *"upon* said lands" (except by implication in the fire-clay seam). It was clearly not contemplated by the clay lease that the lessee could build haulage roads through any seams of coal which might be on another plane in the same tract. The acquiring by Thomas in 1913 of this privilege is a recognition on his part that he did not previously possess it. While the 1905-1913 *clay* lease gave him a license to "explore, mine and dig for clay" in or through any part of the land, the 1913 *coal* lease conferred upon him the right to complete possession of the "A" seam of coal with the right to mine and remove all of it, and to haul fire clay through its openings.

Defendant offered evidence showing that the tunnel was being driven by Haws & Sons through the "A" seam of coal in *1912*. This fact standing by itself would not prove the existence of a paramount title in *1913* in A. J. Haws & Sons, Ltd., to the "A" seam of coal or to any

part of it, unless the right to carry on such operations in this coal seam had been conveyed directly or indirectly to A. J. Haws & Sons, Ltd., by the owners thereof. There is no such evidence in the record.

Nor is there any merit in the contention that possession of the "A" seam of coal was never delivered under the coal lease of 1913 by the lessor to James P. Thomas, trustee. The coal lease of 1913 was executed, acknowledged, delivered and recorded. This in itself constitutes sufficient proof of possession by James P. Thomas, trustee. Appellant concedes in his paper book that "had the instrument in question been a sale of mineral in place, no such proof of possession would be necessary to sustain plaintiff's case, but the instrument here in suit is clearly a lease and merely for a term of years and therefore does not come under the principle of possession being presumed under a fee simple grant." The coal lease between Clarence S. Dougherty et al., and James P. Thomas, trustee, grants to the latter "the exclusive right to mine and remove *all of the coal* in the 'A' seam underlying said tract of land hereinafter described." The agreements were for a limited or definite term but it was clearly contemplated by the parties that this term was ample to mine all of the coal in the tract. In Sanderson v. City of Scranton, 105 Pa. 469, it was held that an agreement leasing to a party all the coal beneath the surface of a certain tract of land of which A was the owner amounted to a severance of the surface and subjacent strata, and a sale or assignment of the coal in place. This court there said: "When the purposes and objects of this instrument are perfected the coal will be exhausted and the lessor can have nothing by the reversion." In Kingsley v. Hillside Coal & Iron Co., 144 Pa. 613, 23 A. 250, this court held that "where a fair interpretation of the written agreement shows that a sale was intended by the parties, and a right to mine and remove all the coal is conferred by it, in express terms or by plain and necessary implication, it will constitute

a sale, *notwithstanding a term is created within which the coal is to be taken out* [italics supplied]." In Advance Industrial Supply Co. v. Eagle Metallic Copper Co. et al., 267 Pa. 15, 20, 109 A. 771, we held that "the fact that the right to take is limited to a term of years, does not make it any the less a sale."

Even if the lease before us should not be construed as a sale of the "A" seam of coal, appellant's contention that possession of this seam was never delivered by the lessor to the lessee would still be devoid of merit. The implied covenant of a lessor as to delivery of possession is merely that there shall be at the time the lessee's right to possession attaches, no impediment to his taking possession. The only such impediment pointed to by defendant is the alleged possession of Haws & Sons, whose clay mining in this tract was under the defendant's general management and personal direction. It would be a legal anomaly if a lessee could successfully invoke as a defense to the payment of an agreed-to rent for a property, a trespass thereon which he himself directed. Since Haws & Sons' alleged "rights" in the coal seam prior to 1913 are based on the clay lease of 1905-1913 they were in this coal seam only as fire clay explorers or as trespassers, for they had no "rights" in there as coal operators or as transporters of fire clay. There was no "title" in them "paramount" or otherwise to the "A" seam of coal.

In support of his proposition that there was an outstanding title to the "A" seam of coal in another, to wit, Haws & Sons, at the time the coal lease of 1913 was executed, appellant cites Trout v. McDonald, 83 Pa. 144, where it was held that the right to mine the coal beneath a certain surface confers the right to make all necessary openings to reach the coal. In that case the court was dealing not with passageways or tunnels to a certain vein of coal but with shafts or slopes on the surface to the coal leased and it held that the lease of coal in the tract of land included by implication the

right to sink the necessary shafts or slopes to reach it. To the same effect is Baker v. Pittsburgh, Carnegie & Western Railroad Co., 219 Pa. 398, 68 A. 1014. In Youghiogheny River Coal Co. v. Allegheny Nat. Bank, 211 Pa. 319, 60 A. 924, this court said (page 323): "When there has been a severance of ownership of the surface and the coal, the owners of the respective estates hold them as estates in land and, of course, the title and rights of each depend upon his conveyance. If the owner of the whole fee conveys the coal in the land in general terms, as in this case, retaining the residue of the tract, the purchaser acquires the coal with the right to mine and remove it, provided he does so without injury to the superincumbent estate." Though appellant had the right to mine and take away clay from the land described in his clay lease, he had no right to injure much less *take* and *occupy* the superincumbent estate consisting of the "A" vein or seam of coal.

Even if we accept defendant's contention that the clay lease gave the lessee the right to drive through the "A" seam of coal to reach the second deposit of clay and afterwards to use that driveway as a haulage road, that would not constitute an' "outstanding title in another" *to the "A" seam of coal.* When James P. Thomas, trustee, in 1913, accepted the lease giving him the exclusive right to mine and remove all the coal in the "A" seam in that tract, he knew exactly what he was getting, for any then current invasion of that "A" seam of coal was under his direction as general manager of A. J. Haws & Sons, Ltd., and the part of the "A" seam so invaded and occupied was of the "A" seam of coal only a negligible part.

Defendant's contention that possession of the "A" seam of coal under the coal lease was never delivered to James P. Thomas, trustee, because of a "paramount title outstanding in another" is overruled.

Defense No. 2 is that the lessors are estopped from now demanding payment of the minimum royalty under

the coal lease. The affidavit of defense sets forth that "no demand or claim was ever made by said lessors or by anyone on their behalf that the said James P. Thomas, trustee, or his cestui que trustent or the Johnstown Mining Corporation should comply or make performance in any manner as lessee or lessees or assignee or assignees under the said 'A' Coal Lease."

Defendant contends there was a waiver of the rental or royalty payments provided for in the lease. "A waiver may be express or implied, but in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part. [citing, inter alia, Diehl v. Adams Co. Mut. Ins. Co., 58 Pa. 443]. A waiver, to be operative, must be supported by an agreement founded on a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition": 27 R. C. L., pages 909, 910, section 5. In Freedman v. Providence Washington Ins. Co. of Providence, R. I., 175 Pa. 350, 360, 34 A. 730, this court said: "Waiver is essentially a matter of intention, and to establish it there must be some declaration or act from which the insured might reasonably infer that the insurer did not mean to insist upon a right which because of a change of position induced thereby it would be inequitable to enforce." A waiver must be supported by a good consideration: Tagg v. Bowman, 108 Pa. 273. Whether there has been a waiver is generally a question of fact, and the sufficiency of the evidence relating thereto is for the jury. See Batchelder v. Standard Plunger Elevator Co., 227 Pa. 201, 75 A. 1090. The party claim-

ing the waiver must, of course, prove the facts on which he relies for such waiver. (See Knickerbocker Life Ins. Co. v. Norton, 96 U. S. 234.) Delay in pressing a claim may be evidence relevant to the issue of a claim's abandonment but such delay does not give rise to a conclusive presumption of its abandonment. In Youst v. Martin, 3 S. & R. 421, 428, this court in an opinion by Chief Justice TILGHMAN said: "The third objection is, that the court ought to have instructed the jury that the contract between McLene and John Martin was rescinded in consequence of the laches of Martin and his heirs. . . . . . Whether the contract was or was not relinquished, was a question depending on a variety of disputed facts. These facts it was not for the court to decide. They submitted them, therefore, to the jury. . . . . . . The defendants, therefore, have no cause for complaint." In Atkinson v. Walton, 162 Pa. 219, 222, 29 A. 898, this court said: "It has never been held, that mere delay of suit, or neglect to rigorously exact his money on the day it was due, is evidence of a waiver of his contract right." The question of waiver in this case was submitted to the jury with proper instructions and its finding was against the defendant.

Defense No. 3 is that there was a failure of consideration because the subject of the coal lease was merchantable and mineable coal, and it was proved that there was no merchantable and mineable coal in the tract.

The subject of the lease so far as it relates to the mining of coal was "the exclusive right to mine and remove all of the coal of the 'A' seam underlying said tract of land." No reference was made as to whether or not the "A" seam was merchantable and mineable except in the 6th paragraph, already quoted in this opinion. However, we will assume that by implication at least the subject of the lease so far as it related to the mining of coal was "merchantable and mineable coal." But this was not the only subject of the lease for when Thomas secured the coal lease in 1913 he apparently had two pur-

poses in mind: (1) He wanted Haws & Sons, who were mining the clay and whose general manager he was, to have an inexpensively constructed passageway cut through the overlying "A" seam of coal from one bed of clay to the other. This right he secured to himself by unequivocal language in the coal lease of 1913. For reasons of his own he never assigned his right under this lease to Haws & Sons, but he acquiesced in their use of the passageway through this seam and this use redounded to his own pecuniary profit as he received 20 cents a ton on every ton of clay they mined in this tract. It was also testified that "some of the Haws interests were held by Mr. Thomas." The right to have this passageway through the "A" seam of coal was in itself a sufficient consideration for the $400 annual rental stipulated to be paid by Thomas as royalty on the "A" seam of coal "whether mined or not." (2) Thomas apparently contemplated engaging in mining operations in this tract, for in the sublease of clay to A. J. Haws & Sons, Ltd., on April 4, 1906, he reserved the right "of mining, quarrying and operating said fire clay and other minerals contained in said lands contemporaneously with the operations of the said Haws therein" and it was provided in that reservation that in the event he engaged in such operations he should pay Haws & Sons one-half of the costs of all improvements made by them in and upon the premises and upon such payment being made the title to such improvements should vest jointly and equally in Haws & Sons and himself as trustee. Thomas, trustee, also owned the railroad track, side tracks and roads over which the coal and clay were hauled by A. J. Haws & Sons, Ltd.

For the rental stipulated to be paid in the coal lease of 1913, to wit, $400 per year, Thomas, trustee, therefore secured (a) the right "to haul coal and fire clay from other lands through the openings and headings made in the land hereby leased," i. e., the "A" seam of coal; and

(b) the right to mine and remove the coal contained in that seam.

If Thomas for his $400 annual rental acquired only the right to mine merchantable and mineable coal and it developed that there was no merchantable and mineable coal in the tract, or that the tract had been denuded of such coal, he might, under the authority of Muhlenberg v. Henning, 116 Pa. 138, 9 A. 144, be entitled to relief from the annual rental payment provided for. The lease before us, however, expressly provides the lessee ample relief from the payment of rental in the event that the merchantable and mineable coal in the "A" seam shall be exhausted before the expiration of the term of the lease. In such contingency the lessee "may surrender this lease and thereupon all his rights......and obligations hereunder shall cease and determine." The fact that Thomas possessed this right of surrender and never exercised it must be accepted as proof that the lease possessed pecuniary value to him. There is other proof to the same effect. There was, therefore, no failure of consideration. In the Muhlenberg v. Henning Case cited above, the court held that the fact there was in the land demised no iron ore of the kind contracted for, the lessees could not "upon any fair or reasonable construction of the contract" be held bound to pay the royalty of $525 annually. Since Thomas had the right to surrender this lease on the exhaustion of the merchantable and mineable coal and did not do so, a "fair or reasonable construction of the contract" is that defendant's rights under this lease were worth to him at least the $400 annual rental he obligated himself to pay for them.

In Bestwick v. Ormsby Coal Co., 129 Pa. 592, 18 A. 538, we held that in a case where the grantees of a bed of coal *and* a right of way over the land in which it was contained, which way was used to transport coal from adjacent lands, executed a deed of release and a surrender of all the coal conveyed and all of the grantees' rights, but continued to use the right of way over the

land, the grantees were bound to continue to pay the annual royalty and that the exhaustion of the mineable coal, except the "ribs," was no defense to an action for royalties. Here as there the defendant's plea of failure of consideration is unavailing.

The judgment is affirmed.