## Cole, Appellant, *v.* Philadelphia Company.

Argued March 30, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*O. R. Hughes,* for appellant.

*Patrick D. Reinhart* and *B. H. Smyers, Jr.,* for appellee.

OPINION BY MR. JUSTICE PARKER, June 29, 1942:

John G. Cole, lessor in an oil and gas lease, brought this action in assumpsit in 1936 against Philadelphia Company, lessee, to recover royalty alleged to be due under the terms of the lease for a period beginning November 30, 1922. The ultimate question presented is whether the lease had been surrendered prior to the time when the royalty claimed became due. The court below decided as a matter of law that the lease had been surrendered or abandoned and that in any event the plaintiff was barred from recovery by laches. We are of the opinions that the court below erred in giving binding instructions and that the grounds assigned are not sound.

On October 15, 1915, Cole leased to Philadelphia Company two twelve-acre tracts of land. The lease *granted*

"to the said Lessee the sole and exclusive right of drilling upon the said land for Natural Gas and Petroleum Oil, the right to construct and maintain pipe lines" and other machinery and equipment useful for the objects of the lease, with right of ingress and egress for the purposes of operation. The term was "for and during the period of Five (5) years from the date hereof [thereof], and as long after commencement of operation as said premises are operated for the production of oil or gas." It provided for the payment of a rental until a well was drilled and for the payment to lessor of $300 per annum, payable quarterly in advance, for each well drilled upon the land which produced natural gas "in a quantity sufficient for the Lessee to convey to market." It provided two methods by which the lease might be surrendered, to which we will refer more in detail later. A well was drilled on one of the twelve-acre tracts and the lessee began to market gas from that well December 1, 1918. The second twelve-acre tract was surrendered.

It is probable that no controversy would have arisen if it had not been for the fact that on December 31, 1919, Cole conveyed the land in question to John Roup with the following reservation : "The first party also reserves all oil and gas produced under present leases, with rights as given under leases and right aways granted." The title of Roup to the twelve acres became vested in Spencer Gump on October 29, 1921, subject to the same reservation as was set forth in the deed from Cole.

On May 24, 1921, John G. Cole, by a writing under seal described as "Royalty Reduction Agreement", agreed, in consideration of the small amount of gas then being produced, that the royalty should be reduced from $300 to $225 per annum. On November 2, 1921, by a similar agreement, the royalty was reduced from $225 to $125 per annum. The court below was of the opinion that since Cole had conveyed the land upon which the lease was located he was without power or right to *extend* the lease. The error at this point was in treating the two

agreements for reduction of royalty as extensions of the lease. While the reservation in the deed from Cole was not skillfully drawn, it is clear that Cole reserved the right to receive the royalties due under the terms of the lease to the Philadelphia Company as long as that lease agreement continued in force. The agreements did not constitute extensions but were mere reductions of royalty, matters in which Cole and the Philadelphia Company alone were concerned and in which the grantee of Cole or his successors in title had no interest. Cole could not and did not enlarge or extend the lease; he merely reduced the royalty which was payable to him.

Some evidence of very doubtful relevancy was received tending to show that the managers of the Philadelphia Company discussed among themselves the advisability of surrendering the lease. They did send their agent to Cole for the purpose of discussing the matter with him. This resulted in the reductions in royalty referred to and the lease was not surrendered. There was some evidence that for a short time the pipe line connecting the gas well with the distributing system of the Philadelphia Company was disconnected but this comes far from being sufficient, even if accepted, to support a finding that the Philadelphia Company either actually surrendered or abandoned the lease, as we shall see later. The plain fact was that the lease was not abandoned or surrendered but the royalty was merely reduced and the Philadelphia Company accepted the written agreements so reducing the royalty.

This brings us to what we regard as the critical point in the case. The well which had been drilled was a shallow gas well in a stratum known as "Pittsburgh Coal" and the production began to wane. A new gas well having been drilled on an adjoining property, the Philadelphia Company, on June 29, 1922, contracted with one Miller to drill the well then on said premises to a deeper stratum. Up to this time the lessee had not learned that Cole had conveyed the land to Roup. When the contrac-

tor and the Philadelphia Company, acting together, were about to commence operations for the drilling of the well to a lower depth, Gump, the then owner of the reversion, notified the Philadelphia Company on September 19, 1922, that "the extension of said lease as made to you [it] by John G. Cole is void, as it was made, executed and delivered after he sold and conveyed said land to me, and he then had no title to said land, or right to extend said lease." He warned the company to stay off the land or he would contest their right by legal proceedings in court.

The Philadelphia Company on September 30, 1922, took a new lease for oil and gas from Gump and proceeded with the deepening of the well with the result that a profitable well was completed in January 1923. The royalty thereon was paid to Gump up to the time of trial. The Philadelphia Company paid the royalty on the well to Cole for a period ending November 30, 1922, and then on October 4, 1922, placed upon record in Greene County a surrender to Cole of the lease of 1915. On October 6, 1922, the company tendered a return of the lease instrument to Cole, which he declined to accept, and refused to pay any further royalty to Cole.

The original lease provided: "The Lessee may surrender this lease at any time that it deems it unprofitable to hold or to operate, provided, however, that all rents and royalties due upon the same shall have been paid to the Lessor, and upon such surrender the Lessee shall be relieved from the further payment of rents or royalties or the fulfillment of any other of the covenants under this lease. Surrender may be made by delivering in person or by mail, this lease to the Lessor, or by filing for record, in the Office of the Recorder of Deeds in the county in which the land is situate, a duly executed release."

The theory of the appellee, supported by the court below, that the lessee could arbitrarily surrender the Cole lease and take a new lease from Gump when it was at that very time continuing to operate the premises "for

the production of oil or gas" is not tenable. The Cole lease covered all the oil and gas on the twelve-acre tract. When the lessee, before the expiration of the five-year term, drilled a profitable well it was not limited in its right to operate to the production from that one well. It had the right to continue operations, not only by drilling additional wells to the same sand as had been opened, but to any other sands on the premises. Certainly it had the right to drill the well then being operated to a lower horizon.* When the lessee proceeded to drill the well to a lower depth it was operating "for the production of oil or gas" just as definitely as if it continued to draw gas from the first sand tapped.

It was also the theory of the appellee and the trial court that the Cole lease was surrendered in accordance with the terms thereof and that therefore defendant was not liable for payment of further royalty. The lessee is not aided by the term of the lease. The exact provision of that clause was that "the Lessee may surrender this lease at any time that it deems it unprofitable to hold or to operate." While we have frequently said that it is ordinarily for the lessee to determine whether it can operate at a profit, the lessee showed that it had determined that it could so continue to operate. It showed unequivocally that it had faith in the potentialities of the property by letting a contract for the drilling to a lower sand at a considerable cost and by taking an overriding lease from Gump. Would anyone contend that a lessee could be heard to say, even in writing, that he surrendered a lease while he at the same time held the premises and continued to operate? It is but an example of the ancient phrase that actions often speak so loudly that the words of the actor cannot be heard. The conduct

---

* Compare the conclusion of the West Virginia Supreme Court in *Ammons v. Toothman*, 59 W. Va. 165, where a much narrower exception was involved. There a deed conveyed all the oil "except the well that is now producing oil." It was held that the exception covered the oil produced when the well was drilled to a deeper sand.

of this lessee was absolutely inconsistent with either an actual surrender or an abandonment.

The lease imposed obligations on lessee as well as lessor. If it had not been for the unfounded claim of Gump, assented to by the lessee, that the agreements for reduction of royalty constituted an extension, this controversy would never have arisen. Gump was bound to recognize the validity of the reservation in the deed from Cole and the deed to him whereby Cole reserved the right to receive the fruits of his lease. To sustain Gump's contention would nullify the reservation.

There is not any merit in the suggestion that by disconnecting the well from the lines of the defendant for a brief interval there was an abandonment. It was necessary to disconnect the well while it was being drilled to a greater depth. The contract for drilling had already been made and its execution had only been prevented by the interference of Gump. A temporary cessation of production is not sufficient to terminate a lease: 2 Sumners on Oil & Gas, §305. The appellee's contention "that the mere cessation of the use of the gas from the well terminated the lease of its own force and relieved the defendant from any further duty to the plaintiff, is entirely untenable": *Double v. Union Heat & Light Co.*, 172 Pa. 388, 392, 33 A. 694. "The cost of developing an oil or gas territory so as to make it yield profit is ordinarily very heavy. It requires both time and money. A cessation of operations for a short time does not signify the same intention as the abandonment of a place of residence or a mercantile room. . . . The time of abandonment or cessation of operations has important bearing on the question of intention, but it is obviously not controlling; for abandonment of the premises for a very short time, accompanied by other acts, showing unequivocal intention not to return to the property or to do further work thereon, would amply justify resumption of possession by the lessor and the execution of a new lease to another party. On the other hand, the cir-

cumstances and conditions may be such as clearly to negative intention to give up the premises when operations have been suspended for a considerable period of time": *Sult v. Hochstetter Oil Co.,* 63 W. Va. 317, 330.

We find no merit in appellee's contention that the lessor was estopped by laches from claiming the royalty because he failed to assert his rights for thirteen years although he knew the royalty was being paid to another. The action is one at law and the doctrine of laches as a bar to recovery is not applicable. "There is no obligation upon a creditor to promptly sue his debtor. The penalty of indulgence by the creditor is not the forfeiture of a right of action against the debtor, unless that indulgence comes within the provisions of the statute of limitations. And in this case the suit being upon a sealed instrument the statute of limitations has no application": *Ahrns v. Gas Co.,* 188 Pa. 249, 255, 41 A. 739. None of the payments sued for was due for as much as twenty years. Consequently there was no presumption of payment which plaintiff was required to rebut in order to make out a case.

While we are of the opinion that binding instructions for the defendant were not proper, it is necessary to consider additional matters to which we have not referred. Defendant by its pleadings and proofs raised an additional question as to whether the plaintiff waived his right to receive payments of royalty after November 30, 1922, and acquiesced in the surrender of the lease of 1915. There was testimony on the part of the defendant, denied by plaintiff, that on October 6, 1922, when representatives of defendant tendered a surrender to plaintiff of the lease of 1915, plaintiff made an offer to defendant's representatives of a lease on another tract of fifty-five acres on which he lived and agreed that if the lease was taken and a well was drilled on that tract he would forego any claim for further royalty and accept the surrender of the lease. A lease was drawn that day, was executed and acknowledged by plaintiff and submitted to the company. It is not disputed that when the new lease was presented

to the proper officers of the company it was accepted by the company. A well was drilled as agreed and royalties were paid to plaintiff until 1935 when the lease on the fifty-five acres was surrendered or abandoned. During that interval, a period of about thirten years, plaintiff made no claim or demand for royalty of defendant knowing that royalty was being paid to Gump on the twelve-acre tract. The evidence presented a question for the jury as to whether there had been a waiver: *Dougherty v. Thomas, Exr.*, 313 Pa. 287, 297, 169 A. 219.

Whether there has been a waiver is usually a question of fact: *Batchelder v. Standard Plunger Elev. Co.*, 227 Pa. 201, 75 A. 1090. To make proof of waiver of a legal right there must be clear, unequivocal and decisive action of the party with knowledge of such right showing a purpose to surrender such right on his part: *Beatty v. Lycoming Co. Mut. Ins. Co.*, 66 Pa. 9; *Dougherty v. Thomas*, supra (p. 297); 67 C. J., p. 306; 27 R. C. L., Waiver, §5. If the testimony is viewed in a light favorable to the defendant, the testimony shows an unequivocal, definite and clear promise on the part of Cole to forego the payment of further royalty and accept the surrender of the lease of 1915. "An agreement to waive the right, if founded on a good consideration, is undoubtedly binding": *Tagg v. Bowman*, 108 Pa. 273, 277. It would not seem to be open to doubt that the taking of a lease on the fifty-five-acre tract and the expenditure of a large sum of money in exploring and developing gas furnished a sufficient consideration to support the waiver. While we have heretofore indicated that laches is not sufficient to bar the claim for royalty, delay in presenting the claim for thirteen years is evidence relative to the issue of waiver. Although undue delay in presenting a suite is not a bar, it is relevant evidence tending to support a claim of waiver: *Atkinson v. Walton*, 162 Pa. 219, 222, 29 A. 898. It is for a jury to determine whether there was a waiver.

The judgment of the court below is reversed and a new trial is awarded.