J. W. CAIN et al., Appellants,

v.

Ethel Schallert NEUMANN et al., Appellees.

No. 13325.

Court of Civil Appeals of Texas.

San Antonio.

June 11, 1958.

On Rehearing July 30, 1958.

On Second Motion for Rehearing

Sept. 10, 1958.

906

Williams, Lee & Kennerly, P. F. Graves, Houston, David A. Grose, Alice, Vinson, Elkins, Weems & Searls, James W. Mc-Cartney, P. R. Rowe, Houston, for appellants.

Morrill & Patton, Beeville, Lloyd & Lloyd, Alice, Head & Lyle, Corpus Christi, Robertson, Jackson, Payne, Lancaster & Walker, Dallas, for appellees.

POPE, Justice.

This is an action in trespass to try title and for the cancellation of an oil, gas and mineral lease. The questions presented are: (1) Whether an assignee of a lesser tract of land out of a larger tract covered by a base oil, gas and mineral lease, by releasing and surrendering the lesser part on which there is paying production and simultaneously taking back a new lease from the landowner, thereby effects a surrender and destruction of the entire base lease, though production in paying quantities continued without interruption; and (2) whether uranium is a mineral within the meaning of the particular base lease.

The trial court granted an instructed verdict in favor of the plaintiffs, whom we shall call the Schallerts. They are the

successors in title to the original lessors. Columbia Southern Chemical Corporation, another appellee, was the assignee of a tract out of the original base lease, and it surrendered its lease to Schallerts in exchange for a new lease. Cain and others are the appellants. They owned the oil, gas and minerals other than salt, and some overriding royalties in lands which were embraced within the original lease. Appellants urge that actual production anywhere on the 3,100-acre tract embraced within the original base lease maintained their lease in force, and that the surrender by Columbia Southern did not affect their rights.

Schallerts in 1918 leased 3,100 acres of land in Duval County to H. A. Speer. The lease was of "all of the oil, gas, coal and other minerals in and under" the described 3,100 acres of land. It granted "the right of ingress and egress at all times for the purpose of drilling, mining and operating for mineral." The only clause with reference to surrender or release rights was, that lessee "shall have the right to remove all machinery, fixtures and implements placed thereon at any time after having given the party of the first part a written release on all rights held by them by virtue of this lease." The lessor reserved as royalty, one-eighth of all oil, four cents per ton for coal, and one-tenth of the market value of gas or other minerals. The lease provided that it would become null and void if drilling operations did not commence within ninety days from the date of the lease, and then provided:

"In case party of the second part shall bore and discover either oil or other minerals in paying quantities, then and in that event, this grant, incumbrance, or conveyance shall be in full force and effect, for twenty-five (25) years, from the time of the discovery of said product and as much longer as oil, gas or other minerals can be produced in paying quantities thereon."

The lease also provided that all conditions between the parties to the lease "shall extend to their heirs, executors, administrators and assigns."

Prior to 1918, the presence of a salt deposit under a part of the leased lands was known. After the 1918 lease, lessees commenced drilling operations and found some productive oil, which soon was exhausted. By continued drilling, a sulphur deposit was found in October, 1928, and sulphur was commercially produced until 1935.

Smith and Cain in 1921 assigned all of their right, title, interest and estate in 1,000 acres of land out of the southeast corner of the larger tract, to National Oil Company and they reserved a $\frac{1}{32}$nd override. This was an absolute assignment with no provision with reference to a surrender and release of the assigned portion of the lease. In 1931, National Oil Company and others assigned all the salt rights in the west 640 acres out of the 1,000-acre tract to Southern Alkali Corporation, now called Columbia Southern.

In 1933, Columbia Southern made an agreement with the Schallerts, the original lessors, to convert the royalty payments for salt under its 640-acre tract into monthly cash payments of $300 instead of a fractional royalty. Columbia's interest was limited to salt only.

In 1934, before the sulphur production ceased, Columbia Southern commenced producing salt by injecting water into an apparently inexhaustible deposit, and piped the brine to its chemical plant in Corpus Christi. This salt production has continued since 1934. In 1951 Columbia Southern paid Cain and others $530,000 for all the salt rights in the rest of the 3,100-acre tract, and also for the $\frac{1}{32}$nd override reserved by Smith back in 1921, insofar as it applied to salt. At this point, Columbia Southern owned all the salt in the entire 3,100-acre tract. In 1950 Columbia Southern purchased from National Oil Company, R. L. Autrey and R. J. Barry, "all the rights, title and interest of the orig-

inal lessee and present owner" in the 640 acres on which it had its original salt rights, but National retained the "oil" beneath 4,000 feet of the 520 acres described, and reserved an override on the "oil."

From appellees' brief it appears that there is no dispute about these facts, nor that the original lease continued in force at least for twenty-five years after the discovery of sulphur in October, 1928, or until October, 1953, by reason of the successive discoveries and production of oil, sulphur and salt on a part of the original 3,100-acre tract. It is conceded also, that in October, 1953, the only mineral being produced was the salt on the Columbia Southern 640-acre tract, and that at that time Columbia Southern owned all the salt in the entire tract. It is conceded further that profitable salt production has continued unabated since October, 1953.

We come now to the matters which resulted in this dispute. Plaintiffs, the Schallerts, owned the possibility of reversion to the entire 3,100 acres. On January 31, 1953, nine months before the expiration of the primary term of twenty-five years, Columbia Southern fully surrendered and released all of its salt and other mineral rights to Schallerts. It released, discharged and quitclaimed "all of its right, title and interest" in and to the Speer lease. Simultaneous with and as a condition to the delivery of the release, Schallerts delivered back to Columbia Southern a new lease covering salt only, which was to continue for ninety days, and as long thereafter as salt was produced or royalties in lieu of salt production were paid. The new salt royalty was fixed at $600 per month in cash for the entire 3,100 acres. The delivery of the release was conditioned upon the delivery of a new lease, and the simultaneous exchange of the two instruments was a single transaction. Veal v. Thomason, 138 Tex. 341, 348, 159 S.W.2d 472, 475; Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 404, 121 S.W.2d 579, 583.

The true question in this case is whether Schallerts, who owned the possibility of reversion, and Columbia Southern, who owned the salt production, could by an agreement between themselves, release and destroy the rights of third persons who owned under the 1918 base lease. The 1918 lease granted a determinable fee. Texas Company v. Davis, 113 Tex. 321, 254 S.W. 304, 255 S.W. 601. The lease of the 3,100-acre tract provided that it would continue in force for twenty-five years from the discovery of minerals in paying quantities, and "as much longer as oil, gas or other minerals can be produced in paying quantities thereon." This clause is the one which we must keep constantly in view. When we are ever aware that it states the event upon which the lease will determine, we avoid distracting features to the case and the case becomes simple.

When Schallerts gave the 1918 lease to lessee, he then had a determinable fee to 3,100 acres, which he could sell, assign, devise, give away, partition, mortgage, or deal with in any manner. He could and did assign smaller parcels to various persons, and those owners in turn obtained a determinable fee to their smaller parcels or tracts, subject to the same determining event found in the base lease. The historic example of the determinable fee is that of A who conveys to B and his heirs so long as St. Paul's stands. If A conveys 100 acres to B so long as St. Paul's stands, and B in turn conveys ten acres to C, the ten acres belonging to C is still a determinable fee. C, who owns his ten acres, can also sell, assign, devise, give away, partition or mortgage his property. He can reconvey to A, but a reconveyance to A does not carry with it a reconveyance, release and surrender of the other 90 acres, so long as St. Paul's continues to stand. And that is all there is to this case.

Is St. Paul's still standing? We find that it is. Production in paying quantities on the 3,100-acre tract was the event which

the lease states will continue it in force. Commencing in 1934, a ton of salt was produced every five minutes of the day. At the time of trial, more than three and a half million pounds, or sixty railroad carloads per day were being produced. Columbia Southern, in 1933, agreed with the Schallerts to pay $300 per month as royalty and Schallerts agreed that such payments could be made in lieu of actual production. Those royalty payments never ceased. At the very moment, on October 31, 1953, that Schallerts and Columbia Southern say that the fee reverted, brine was flowing unabated through the pipeline in precisely the same manner as it had for eighteen years, except that the amount of production had increased. At the time of trial it had not stopped. The event which would determine the fee to the lands covered by the 1918 lease was the cessation of production "in paying quantities thereon." Production "in paying quantities thereon" has not ceased. In Cole v. Philadelphia Company, 345 Pa. 315, 26 A.2d 920, 923, the Court held that a surrender of an old lease in exchange for a new lease when there was production under the terms of the old lease, did not destroy the rights of others claiming under the old lease. "Would anyone contend that a lessee could be heard to say, even in writing, that he surrendered a lease while he at the same time held the premises and continued to operate? It is but an example of the ancient phrase that actions often speak so loudly that the words of the actor cannot be heard. The conduct of this lessee was absolutely inconsistent with either an actual surrender or an abandonment." In other words, even if there were an express surrender clause, non-production must be the fact, not a mere recital.

Several of appellees' arguments in support of their contention that the whole 3,100 acres has reverted, fail to keep in mind the determining event, cessation of production on the 3,100-acre tract. To mollify their contention that the whole lease was destroyed, Schallerts and Columbia Southern stress the point that they owned the salt in all the 3,100 acres. They assert that Columbia Southern released only its rights, and that they intended by the release to terminate the 1918 lease only as to the "limited interests owned by Columbia Southern." To emphasize this, we are pointed to the release which recites that Columbia Southern only released "its" rights. They argue that Columbia Southern, the sole owner of its rights, did not need the approval of others in dealing with its rights. It is stated: "There was no attempt to destroy any rights of appellants. * * * Obviously Columbia Southern Chemical Corporation could not release rights it did not own."

The softness of appellees' disavowals of harsh purpose is somewhat lost when we view the true result of their contentions and the judgment of the trial court. Columbia Southern declares that it could do as it wished concerning its own property. No one quarrels about that. Having said that, Columbia Southern joins with Schallerts in contending that in surrendering "its" lease there was no longer a base lease. Though production continues unabated, by the judgment appellants no longer own the oil, gas and minerals other than salt, in about 2,100 acres of land included in the base lease. Their overriding royalty on minerals other than salt, in the 640-acre tract owned by Columbia Southern, has been obliterated. Schallerts have given a new lease to Columbia Southern of all minerals, including uranium, but excepting oil, gas, sulphur and salt, to the entire 3,100 acres. Before the delivery of the release, appellants owned something; after the release, appellees say appellants own nothing.

The fallacy of Schallerts' and Columbia Southern's logic is seen when we state the proposition correctly and then reduce their argument to its rudiments. The correct statement of the proposition is found in the 1918 base lease. It states that the lease will be in force for twenty-five years from the discovery of minerals in paying

quantities "and as much longer as oil, gas or other minerals can be produced in paying quantities thereon." Appellants, before the 1953 release, owned property rights, and those rights would terminate upon the event stated by the 1918 lease, which was (1) the cessation of production (2) "thereon" (the 3,100-acre tract). To prove that the terminating event occurred, Schallerts and Columbia Southern reason as follows: Continuous production of a mineral on the 3,100 acres will maintain the base lease in force. Appellants at the time of the 1953 release did not own the mineral which was being produced. Columbia Southern, the owners, in 1953 surrendered that mineral. They now own it under a new and different lease. Production of that mineral is therefore no longer under the 1918 base lease but is under the new lease. Production under the base lease has ceased.

Thus defrocked, the argument exposes its frailties. The first error is that appellees shifted grounds. They do this by importing into the original proposition the matter of "ownership" of the mineral being produced. To argue that appellants did not own the mineral being produced in 1953 is irrelevant to the test stated in the 1918 lease. That lease imposes no such requirement. Ownership of the mineral is smuggled into the proposition by argument. Appellees are therefore correct about an irrelevant matter.

■■ The happening of the determining event, the cessation of production, expressed in the 1918 lease, was not tied to nor dependent upon who in the future would own the production. The lease states that production on the 3,100 acres would continue the lease. Production on any tract within the 3,100 acres is production "thereon", for "the law appears settled that in the instance of a lease of the type mentioned production from any one of the tracts of land described in it serves to perpetuate the lease as to all." Hillegust v. Amerada Petroleum Corp., Tex.

Civ.App., 282 S.W.2d 892, 896; DaCamara v. Binney, Tex.Civ.App., 146 S.W.2d 440, 442; Hunt Production Company v. Dickerson, Tex.Civ.App., 135 S.W.2d 597. In our illustration, where A conveyed to B and his heirs so long as St. Paul's stands, who owned St. Paul's was an irrelevant factor. Likewise, who owned the production from the 1918 lease is unimportant, so long as there was production on the lands described by that lease. See Camden, Atlantic & Ventnor Land Co. v. West Jersey & S. R. Co., 92 N.J.L. 385, 105 A. 229.

The other fallacy in appellees' logic is that they have reasoned in a circle. They concede that there is production of salt, a mineral, but they reason that production is not under the old 1918 lease. Why? Because it is under the new lease. This merely assumes the thing that appellees must prove.

Stripped of these distracting arguments, we find that the 1918 base lease declares that continued production of a mineral, without regard to who owns the mineral, on the 3,100-acre tract maintains the base lease in force. Salt, an admitted mineral, has been continuously produced on the 3,100-acre tract. The base lease is therefore continued in force. Appellants, before the 1953 lease, owned property rights under the clear terms of the 1918 lease. They did not surrender that ownership, and so long as production continued, nobody else could.

■ We shall now determine whether anything in the 1918 lease empowered an assignee of a part to surrender the entire 3,100 acres so long as production continued. Here again we must keep our attention upon the base lease. The 1918 lease does not contain a surrender clause nor a partial release clause. The clause in the lease which Schallerts and Columbia Southern claim empowered them to surrender and destroy the existing lease, not only with respect to salt and minerals, but with respect to all minerals of all own-

ers on the entire 3,100-acre tract, is this clause:

"* * * party of the second part, his heirs and assigns * * * shall have the right to remove all machinery, fixtures and implements placed thereon at any time after having given the party of the first part a written release on all rights held by them by virtue of this lease * * *."

The purpose and intent of that clause was to grant a right, which it then defines as "the right to remove machinery and fixtures." Columbia Southern did not seek to exercise its right to remove machinery and fixtures. They are still in place, unremoved, and production continues. The clause which permits the removal of fixtures has never been extended to mean that a sole assignee was invested with power to add to, take from, excuse or rewrite the terms of a stated event which alone will determine the fee of other owners under the base lease. The clause means that when production is no longer profitable, Columbia Southern may close down, give a release, and remove its fixtures. Woodson Oil Co. v. Pruett, Tex. Civ.App., 298 S.W.2d 856; Orfic Gasoline Production Co. v. Herring, Tex.Civ.App., 273 S.W. 944; Wisconsin-Texas Oil Co. v. Clutter, Tex.Civ.App., 258 S.W. 265; Tex. Com.App., 268 S.W. 921.

The ordinary words of a fixture release clause do not empower the owner of the fixtures to alter the meaning of the determining event as stated in the base lease. In our opinion, the owner of the possibility of reversion, the Schallerts, could make any agreement with Columbia Southern concerning its rights they desired, but their agreement could not alter the terms of the base lease, which fixed rights and powers of other persons. Those rights are unaffected by the release between Schallerts and Columbia Southern, so long as production in fact continues.

The next important point is whether the 1918 lease conveyed uranium and other fissionable substances. Schallerts and Columbia Southern make the point that uranium was not included in the 1918 lease, but they do not brief the point. Instead they pitch their whole case upon the proposition that the 1918 lease expired by reason of the non-production under the 1918 lease, occasioned by the 1953 release from Columbia Southern to Schallerts. Since we have determined that the lease was not terminated, we shall discuss the point whether uranium was embraced within its terms. Schallerts in 1956 leased the uranium, vanadium, thorium and other fissionable minerals to Columbia Southern. In our opinion the 1918 lease was still operative and appellants owned those minerals. We find no Texas precedents which discuss uranium, but the usual arguments that uranium is not embraced within a lease are that the ejusdem generis rule excludes uranium from the meaning of the lease and that uranium was unknown and hence was unintended to be included when the lease was executed.

Our examination of the 1918 lease shows that it sold and conveyed "all of the oil, gas, coal and other minerals in and under" the described 3,100 acres of land. It granted the right of ingress and egress for the purpose of drilling, mining and operating for minerals, and to conduct all operations and to lay the pipe necessary for the production, mining and transportation of the oil, gas, coal or other minerals. The royalties have been previously stated, but it is noted that a royalty is called for on oil and coal, and then provision is made for other kinds of minerals, stating: "If gas or other minerals are found, party of the second part agrees to pay to the party of the first part one-tenth (⅒) of the market value of said gas or minerals so found and marketed." The lease provided: "In case party of the second part shall bore and discover either oil or other minerals in paying quantities, then and in that event, this grant, incumbrance or conveyance shall be in full force and effect, for twenty-five (25) years, from the time

of the discovery of said product and as much longer as oil, gas or other minerals can be produced in paying quantities thereon." An excellent treatment of the ejusdem generis rule, insofar as it might exclude uranium from some oil and gas leases, is found in Evangelical Lutheran Church v. Stanolind Oil & Gas Co., 8 Cir., 251 F.2d 412, which discusses at some length the analogous case of MacMaster v. Onstad, N.D., 86 N.W.2d 36. The broad language of the 1918 lease which granted "all of the oil, gas, coal and other minerals," the royalty clause which also included a royalty for unnamed minerals, and the other clauses in the 1918 lease, reveal an unrestricted grant of minerals, including uranium. Rio Bravo Oil Co. v. McEntire, Tex.Com.App., 128 Tex. 124, 95 S.W.2d 381; Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217; Watkins v. Certain-Teed Products Corp., Tex. Civ.App., 231 S.W.2d 981; Warner v. Patton, Tex.Civ.App., 19 S.W.2d 1111; Elliott v. Nelson, 113 Tex. 62, 251 S.W. 501.

■ Whether the lessor and lessee knew of uranium at the time of the lease does not alter their expressed intent to convey "all" minerals. Texas Company v. Daugherty, 107 Tex. 226, 234, 176 S.W. 717, 719, L.R. A.1917F, 989; Luse v. Boatman, Tex.Civ. App., 217 S.W. 1096; New Mexico & Arizona Land Co. v. Elkins, D.C., 137 F. Supp. 767; Adoue, Howell and Simmons, Mineral Laws of the State of Texas in Relation to Fissionable Materials, 7 Baylor 1. Rev., 247, 256 (1955).

The judgment of the trial court erroneously decreed that the oil, gas and mineral lease dated November 5, 1918, known as the Speer Lease, has terminated. It erred in adjudging that the lease be removed as a cloud upon the 3,100 acres of land. The judgment also in error decreed that the uranium lease executed March 13, 1956, by the Schallerts to Columbia Southern Chemical Corporation was valid. The judgment is reversed and here rendered that the appellees take nothing against appellants. Costs are adjudged half against the Schallerts' interests and half against Columbia Southern Chemical Corporation.

W. O. MURRAY, Chief Justice (dissenting).

I do not concur in the majority opinion and therefore herein state my reason for such dissent.

The majority opinion correctly states that the first question raised is as follows:

"(1) Whether an assignee of a lesser tract of land out of a larger tract covered by a base oil, gas and mineral lease, by releasing and surrendering the lesser part on which there is paying production and simultaneously taking back a new lease from the landowner, thereby effects a surrender and destruction of the entire base lease, though production in paying quantities continued without interruption."

It might here be stated that the assignee of the lesser tract had a complete and absolute transfer of all the rights, title and interest of the original lessee of the larger tract, and there was nothing in the assignment that prohibited him from surrendering that part of the lease owned by him, or required him to have the consent of the assignor before he could effectively surrender his part of the lease. Nor was there any other provision in the assignment that in any way restricted assignee's right to surrender its part of the lease. There was an outstanding over-riding royalty, but this does not prevent a surrender of the lease. Under such circumstances, assignee has a perfect legal right to surrender its part of the lease, and appellants have not shown themselves to have any right to object to such surrender, or to have a right to set it aside, especially since the surrender was accomplished with the consent of the original lessor or those standing in the shoes of such lessor. Appellants will not

923

be heard to complain because appellee has done that which it had a right to do.

Where an assignee has a legal right to surrender its part of the lease to the original lessor, strangers to such transaction will not be heard to object, and any attempt to set aside such surrender will be denied.

After the surrender of that portion of the original lease held by assignee, and after the expiration of the twenty-five year period, there was no production on that part of the lease which had not been surrendered, and therefore the base lease terminated by its own provisions.

After the termination of the base lease appellees were free to acquire from the landowner a new lease upon the entire original tract or any fractional part thereof. There is no contention that assignee acted fraudulently in surrendering its part of the lease. The fact that after the old lease was surrendered and the new lease became effective, salt was produced from a part of the 3,100-acre tract covered by the original lease, is immaterial, as such production was under the new lease and not under the original lease, although upon land at one time covered by the original lease.

I have found no authority directly in point, but feel these conclusions can easily be arrived at from many authorities which indirectly support them.

On Motions for Rehearing.

POPE, Justice.

By appellees' motions for rehearing, our attention is called to several quitclaims, releases and disclaimers which were filed by some of the defendants in this action. The trial court adjudged lands covered by those instruments to be in appellees, and we grant the motions for rehearing in part, and affirm the judgment for appellees for those lands. 41–A Tex.Jur., Trespass to Try Title, § 114.

The motions for rehearing are otherwise overruled.

On Second Motion for Rehearing.

Appellees by a second motion for rehearing correctly point out that this cause was a suit to declare the termination of the 1918 Speer lease, and not, as stated in our opinion, a suit in trespass to try title. They also argue that many parties did not perfect an appeal from the judgment of the trial court. The suit was not one for trespass to try title. The judgment of the trial court will be affirmed also with respect to the parties who failed to perfect an appeal.