## MOORE *v*. MILLER.

In estimating the language which constitutes a lease, the form of words used is of no consequence; it is not necessary that the term *lease* should be used. Whatever is equivalent will be equally available, if the words assume the form of a license, covenant, or agreement, and the other requisites of a lease are present.

A parol agreement that a person should enter on the land of another, dig ore, erect buildings, &c., and pay *fifty cents a ton* for all ore removed, amounts to a lease; but the duration of such lease is to be determined by the jury, to whom it must be referred to say whether, upon all the evidence in the case, it was at will, or from year to year, under the instructions of the court as to what constituted a lease for a year, and what a tenancy at will.

Where the main fact in a cause under trial, was, as to the duration of a parol agreement or lease, and the testimony, which was opposing, and in some respects conflicting, only showed certain facts, from which the main point or fact might be presumed or inferred: the determination of the case, under all the evidence, is for the jury under proper legal instructions.

It is error, if the court, at the request of either party, withdraw a case from the jury, if there be any matter in controversy under the evidence given, legitimately referable to them for determination: but if the evidence be clearly insufficient, the court may so instruct the jury.

In error from the Common Pleas of Cumberland county.

*June* 2 and 3. Thomas C. Miller brought *trespass quare clausum fregit*, against Johnston Moore, the plaintiff in error, to recover damages for the forcible expulsion of his hands from a mine-bank, and the pulling down of a cabin erected there for the workmen, as alleged by the plaintiff under a lease from the defendant, in consequence of which he was put to expense in searching for another ore-bank, to use indifferent ore, and his furnace at last compelled to stop for a short time on account of it. The defendant pleaded the general issue and "*liberum tenementum*," to which the plaintiff replied as follows:—

"And the said Thomas C. Miller, as to the said plea of the said Johnston Moore, by him pleaded, as to the said several trespasses in the introductory part of that plea mentioned, and therein attempted to be justified, saith, that he, the said Thomas C. Miller, by reason of anything by the said Johnston Moore in that plea alleged, ought not to be barred from having and maintaining his aforesaid action thereof against him, the said Johnston Moore, because he saith, that whilst the said close, and the said building, cabin, and out-house, and the said iron-ore bank, with the appurtenances, was the close, bank, and freehold of the said Johnston Moore, and before the said time, when, &c., to wit, on the 15th day of August, 1844, at Dickinson township aforesaid, he the said Johnston demised the said close, building, cabin, and out-house, and ore-bank, with the appurtenances, to the said Thomas C. Miller, to have and to hold the same to him, the said Thomas C. Miller, for and during and until the full end and term of one year from thence next ensuing, and fully to be completed and ended, and so from year to year, for so long a time as they, the said Thomas C.

Miller and Johnston Moore, should respectively please.   By virtue of which said demise, he, the said Thomas C. Miller, afterwards and before the said time, when, &c., entered into the said close, building, cabin, and ore-bank, and became and was possessed thereof, and continued so thereof possessed from thence until the said Johnston Moore afterwards, and during the continuance of the said demise, to wit, at the said time, when, &c., of his own wrong, broke, and entered the said close, building, cabin, and ore-bank, and committed the said several trespasses, in the introductory part of said plea mentioned, in the manner and form as the said Thomas C. Miller hath above thereof complained against him, the said Johnston Moore."

To this replication, the defendant rejoined, denying the demise, and the form thereof, and all the averments of the plaintiff, as stated therein.

At the trial, before HEPBURN, P. J., the plaintiff called the following persons as witnesses, who testified, in substance, as follows:

Levi Trego: "I was present and heard Miller agree to pay *fifty cents* a load for ore, and Moore agreed to take it.   No time set to commence.   Miller was to get the ore outside the corner of the field, where he dug in the woods.   Moore told him to go on then, open the bank, and see what could be done.   Moore did not say how long Miller was to have it.   Saw Miller take ore out of the bank."

Jacob Trego testified that in August or September, 1844, he heard the parties agree upon *fifty cents a load for the ore*, that Miller opened at the corner of a field, in the woods, on Moore's land.

James Oliver: "On the 20th of August, there was part of a load brought to the furnace from Moore's.   On the 11th of September, the first dug ore was brought.   On the 5th day of August, 1845, Mr. Moore and General Miller came into the office.   General Miller said Moore wanted a statement of his account.   I commenced making out a statement; whilst I was doing that they were talking about the iron business, and spoke of the raising of the ore on Moore's land.   Mr. Moore intimated that he should quit digging there.   General Miller said it would be breaking in on his arrangements entirely, that he had bought a depot at Allentown, and contemplated bringing ore back as he took pig iron there.   This bank was on the road there—the best one.   Mr. Moore said he could not be responsible for the general's arrangements—that he must quit.   The general alleged he had a right to raise ore there; Moore allowed he had no right, and must quit.   Moore said he

would go out that day and discharge the hands. General Miller said he was unwell or he would go out, and before he would give it up he should break all the bones in his body. By that time I had the account made out, and I handed it to Mr. Moore. He looked over the account and objected to some prices charged for sawing, and said that it was not according to the agreement in reference to the prices. I altered the account. The ore was settled for at fifty cents a load. Moore made no objections to it. He asked if that was the price we were paying others. The ore was of a very good quality for bar iron metal. That kind of metal is most saleable. They were not a very long time digging there; they got sixty-nine loads, I think."

John McKinney: "I went with Miller to the store the day they commenced opening the bank. We waited till about ten o'clock, till Moore came there. General Miller told him he had come now for the purpose of making a commencement at the ore-bank. Moore told him he was satisfied he should go on and do so. Miller then spoke of what way he was to have the ore. Moore asked Miller what his contract was at other places that he was getting ore? He told him he was paying to William Houston and others fifty cents a load. *Moore then told him he should have his ore at the same; there was something spoken about timber for cabins; Miller asked him what kind of a lease he was going to give, and Moore told him as much ore or as long as he wanted, or something to that amount; I can't just mind the words. Miller asked him whether it was worth while to have a written article? Moore said, Not betwixt us. Something was said about timber for cabins. Miller said he would have to put up cabins for hands, and would want timber, and Moore was to show him where to cut the timber.* That is all I heard about the contract. I went and brought two hands from Houston's bank, and went to work that afternoon at Moore's bank. This was in the last of August or first of September, 1844."

Philip Parlet: "Peter Myers, Joseph Miller and me, and I think Mahew, put up one cabin. We commenced in the morning, worked that day. John Mooney, the wagoner, was there, and the team; it was General Miller's team. Moore came there about the middle of afternoon. He asked us where we cut the poles for the cabin? We told him. Said it was not the place he allowed; but being they were cut, it might go so then."

Jacob Swawn testified, that in the fall of 1844 he worked at Miller's ore-bank on Moore's land; that Moore came there at times, and that on one occasion the witness let him down in the

shaft to examine it; and that when he came out of the shaft, he expressed himself well pleased. That on the 7th or 8th of August, 1845, Moore came to the bank where witness was still working for Miller, stopped him and the other hands from working, ordered and drove them off, and with the assistance of two men who had been waiting for his arrival at the bank, pulled down a cabin erected by Miller for the miners.

Thomas Hunt: "I had worked on the bank in 1844—worked till about Christmas or New Year's. Sometimes five or six hands. Moore would come along frequently and stop. The shaft was about thirty-five or forty feet deep. We had a ladder and lowered him from bench to bench till we got him into the drift. He asked me the quality of the ore—I told him it was very good ore, and there was plenty of it. He seemed very well satisfied. He took a candle and went into the drift; I went with him; he seemed satisfied that the ore was plenty as it was. He was in the shaft and drift two or three times. He asked me what Miller was giving Houston for ore. I told him fifty cents a load. He said he was very well pleased at that, and that he had bargained with Miller for that, *to let him have ore to blow his furnace as long as he wanted.* I was at work at the bank when he came to turn us out. We had been there two or three weeks. He rode up and asked what we were doing there. I told him, digging ore. I was cutting trees. He said he wanted to know what we were cutting trees down for. We told him we were cutting the trees so that the sun could dry the ore. He told us all to stop, that we should not have any more ore from there—should not work any more there. He stayed there, and told us to load our things on the wagon, as it came from the depot, and clear out. He stayed there till we loaded all our things on, and made us all go off from there. He took Chambers, Evans, and Ike Neal, and went to work to tear the chimney down. He would not give us time to get our cooking things out of the cabin, till he had stones against our legs coming out of doors."

James Oliver: "We were compelled to send our hands to other places in search of ore, after we were driven off this bank of Moore's. The first set started out to it, but another set started out a short time after them. First set worked on Weakley's farm, five hands. The whole amount of work for ore without any beneficial results, amounted to eight months, one hand. Some are paid $14, some $15, and some $13 a month—amounting to about $120. After the hands were driven away, we used Peffer's ore and mountain. We had not used any mountain ore that blast, till the hands

were driven away. The valley ore and Peffer's ore would make about 25 per cent. more iron with the same quantity of coal than the mountain ore alone. The loss to General Miller at the furnace, by being deprived of this bank, in being compelled to use mountain ore, would be about 6 or $6\frac{1}{2}$ tons of pig metal—pig metal was worth about $24 or $25 a ton. Forged pigs sell more readily than foundry.

"*Cross-examined.*—There were but two loads of ore taken from this bank in 1845—one load on Saturday, 2d of August, and another on Monday, the 4th, and none before or after. This thing happened on the 5th.

"*In chief.*—Tools and loss of stock about $23. The furnace was stopped two weeks for want of ore—would make twenty tons of iron a week. Started on the 17th of July, and on the 11th of October, 1845, stopped again—blowed again the 3d of November, and blowed out on the 8th of December, 1845.

"*Cross-examined.*—Thinks General Miller had made a blast of three months without stopping up before that. There would not have been any necessity to stop for ore if this had not happened, from what they said of the vein."

The defendant then proved, that in the fall of 1844 Miller was very anxious about the presidential election, as he believed that if Polk were elected, the tariff would be reduced so low that he could not live under it; that he said repeatedly, if the tariff of 1842 should be repealed, he would sell off his stock, get his horses off his hands, and never start the iron business again; that after the election, he said repeatedly that he would quit the business; that on the 29th of January, 1844, he held a vendue, sold a good many horses, a number of wagons, a great many stoves, ploughs, &c. He did not sell any of his good wagons, nor did he sell his furnace tools. He said he kept a few of his horses, which James, his son, was to have for farming; and that he would never blow in his furnace again. The mining was stopped for some time during that winter. The hands at the ore-banks and the wood-choppers were stopped for a while; but commenced again in February, 1845. Hands not all discharged. Miller started again in July, 1845, when he bought some horses and hired some teams. The wood-choppers commenced cutting wood in about three or four weeks after the sale.

The plaintiff's counsel requested the court to charge the jury upon the following points :—

1st. That if the jury believe that Johnston Moore made a con-

2A

tract with General Miller that the latter should dig ore out of Moore's bank, and pay Moore fifty cents a load for the ore so dug; and that, in pursuance of that agreement, Miller, with the consent of Moore, erected two cabins on the land for his hands; took possession of and opened the bank, dug ore, and settled for it with Moore at the stipulated price; that these facts, in the construction of the law, would amount to a lease, not determinable at the will of either party before the end of the current year.

2d. That much more would this be so, if the jury believe that, in addition to the facts stated in the first point, that Moore agreed that Miller should have the ore of said bank, as much as he wanted, and as long as he wanted.

3d. That even if the jury believe that Miller contemplated stopping the operations of his furnace, at the time of his sale, in 1845; yet, if he began cutting wood for furnace purposes some few weeks after, started his furnace on the 17th July next succeeding, set hands to work at the ore-bank, and settled with Moore at 50 cents a load, for some two or three loads of the ore that was dug after the starting of the furnace, on the said 17th of July, that this would amount to a recognition of a subsisting tenancy of the ore-bank by Johnston Moore, and a re-establishment of the same.

The defendant's counsel requested the court to charge the jury upon the following points:—

1st. If the contract between Thomas C. Miller and Johnston Moore was as proved by Levi and Jacob Trego, the plaintiff's witnesses, it created no such *tenure, estate,* or *term* in Thomas C. Miller, as Johnston Moore could not terminate at his will; and if the plaintiff's cause of action depends upon the contract as proved by those witnesses, he is not entitled to recover in this action.

2d. That in the absence of proof, there is no implication *arises in law* that the plaintiff was to hold and enjoy the privilege of *taking ore* for *a year, from year to year,* or any other determinate period; and in the absence of proof fixing *a term or definite period,* the plaintiff cannot recover in this action.

3d. That if the jury should believe all the testimony of John McKinney as to the conversation between Miller and Moore, and the contract then alleged to have been made, and should believe all the testimony of Thomas Hunt as to what Mr. Moore said, and all other evidence in the cause that would not in law establish any *tenure, estate,* or *term,* in Thomas C. Miller, by virtue of which he was entitled to hold possession of the ore-bank and premises

described in the pleadings against the will of Johnston Moore; and the expulsion of the plaintiff's workmen under such circumstances, would not entitle him to maintain this action of trespass *quare clausum fregit.*

4th. If the jury believe that the plaintiff, in the fall of 1844, stopped all operations at his furnace, declared his determination to carry on the business no longer, and sold out all his stock except what he retained for farming purposes, and left the ore-bank, with all his workmen, he could not, under all the evidence in this cause of his agreement with Johnston Moore, afterwards, in the following August, take and hold possession of the ore-bank and lands, as described in the pleadings, against the defendant's will; and having taken possession thereof without his knowledge, he had a right to expel him, and therefore the plaintiff cannot recover.

5th. That the plaintiff has failed to prove the facts as set out in his pleading, and therefore he cannot recover, and the verdict should be for the defendant.

6th. If the jury believe that at the time the account between Johnston Moore and Thomas C. Miller was settled, the former expressly denied the right of the latter to take ore out of the bank at that time, and declared that he would go immediately and turn his workmen out; that the plaintiff replied that he would have to break his bones, if he was there, before he should do it; and that the account was not paid, nor anything more done about it: these facts are not such as can be construed into a recognition or renewal of the plaintiff's alleged right.

The court then instructed the jury thus:—

"The first question for your determination under the evidence, is, was there any such lease made between the plaintiff and the defendant, as contended for by the former? The one asserts it, and the other denies it, in the different propositions which we are requested to instruct you upon as matters of law.

"If you find a lease was made, then your second inquiry will be, as to the amount of damages you think the plaintiff entitled to. If no lease were made, then of course the plaintiff fails; he will have no footing in court, and the defendant will be entitled to your verdict.

"Answers to defendant's points: 1st. The contract, as stated by Levi and Jacob Trego, *alone* would not create such an estate or tenure in General Miller as that Moore could not terminate it at his will. And the case resting alone upon the testimony of those two witnesses, we instruct you as requested. But you must determine

from the whole testimony in the cause, whether the lease or contract as contended for, was made between these parties, and not from detached portions of it. The Tregos tell you what they heard; other witnesses speak of what they know and heard; and it is from the whole you will say, whether this contract to lease this ore-bank to the plaintiff was made or not.

"2d. The first branch of this point is true, and the latter one is also true, as qualified by my answer to the defendant's first point.

"3d. We cannot instruct you as requested in this point.

"4th. The stopping of his furnace by the plaintiff, and other circumstances alleged in this point, if the determination of General Miller alluded to was never communicated to Johnston Moore, would not have the legal effect contended for by the defendant; and particularly so, if the jury are satisfied from the evidence that the furnace was stopped and operations suspended for the short time alleged to have been by the plaintiff, in a portion of his third point—which I will now read, so far as it relates to this particular inquiry.

"5th. As a question of law exclusively, we cannot give you the instructions desired in this point.

"6th. This is true if you find the facts to be as stated.

"Plaintiff's 1st and 2d points. If you are satisfied from the whole evidence in the cause, that Moore did make a contract with Miller, as stated in these two points, we instruct you as requested.

"Plaintiff's 3d point. This point, and the sixth of the defendant, give us the legal views of these parties in reference to the facts which they embody; and if you are satisfied the facts are as stated by the defendant, they could not be construed into a renewal of the plaintiff's alleged right to take this ore. But you will also remember that we have already said, if you were satisfied from the whole evidence in the cause that Moore did make a contract with Miller, as is alleged by the plaintiff in his first and second points, that in law would amount to a lease, not determinable at the will of either party before the end of the current year. The lease, then, if one was made (of which you alone will judge), was not made until the latter part of August, 1844. The current year, then, would bring the time up until the latter part of August, 1845, and this alleged trespass (if one was committed, of which also you alone will judge,) was committed on the 5th day of August, 1845, so that no renewal

of the lease or contract would be necessary to entitle the plaintiff to hold for the year under which he entered.

"It is for you then to say how this matter is. Was there such a contract made between these parties as the plaintiff alleges there was? If there was, did the defendant forcibly expel the plaintiff's hands, &c., as is contended for by him? If these things are so, then he is entitled to such damages as you are satisfied he has sustained by reason of it. On the other hand, if no such contract or lease was made of this ore-bank to the plaintiff—or no trespass committed—then the plaintiff fails, and your verdict should be for the defendant."

Charge excepted to by the defendant.

The jury found a verdict for the plaintiff. The defendant sued out this writ, and assigned the following errors here.

1. The court erred in their answers to the defendant's second, third, fourth, fifth, and sixth points.

2. There was error in the answers of the court to the plaintiff's points.

*Reed* and *Watts*, for plaintiff in error.—There was error in the affirmative answers of the court to the first and second points of Miller, the plaintiff below. The issue was, whether there was a specific demise for one year; and the plaintiff was bound to prove this fact, before he could recover. Demise a technical word, and means a lease for a year, or years. To constitute a lease, it must have a certain commencement, and a certain termination, either expressly, or by reference to something expressed so as to render it certain: 2 Shep. Touch. 70, 31; Law Lib. 3, 4, 7, 9. All leases for uncertain terms, are *primâ facie* leases at will. It is the reservation of an annual rent, which turns them into leases from year to year: 2 Wm. Black. R. 1173. A mere general letting, or a letting as long as the parties please, is a lease at will: Richardson *v.* Langridge, 4 Taunt. R. 128; 4 Bac. Abr. 178, 181. In this case, it was a mere license to enter and take ore, or at most a lease at will. In either aspect, Moore had a right to take and hold possession by force: Overdeer *v.* Lewis, 1 W. & S. 90; 4 Kent's Com. 113. Nothing in the supposed agreement indicating any length of time the license was to continue, and there was nothing to which it could be referred to render the period certain. An annual rent indicates the term of one year. A lease for the purpose of farming, or for any other purpose where there is an annual return made, constitutes by implication a term for a year. But, in these respects, a lease

or agreement is to be construed according to its character. A general letting for raising liquorice or madder (to raise which requires two years), may be implied to be for two years: 2 Wm. Black. Rep. 1171; Chit. on Con. 322, in note. In letting lodgings, no implication of a demise from year to year, or for any specific time. A mere license to use land, is not within the statute of frauds, because it passes no interest in the land: 7 N. Hamp. R. 237; 16 Pick. 273; Chit. on Con. 240. A sale of potatoes in the ground, growing, with the right to take them away, only gives an easement to go on the land; it passes no interest to the land, and trespass will not lie: 11 East Rep. 362. In Anderson's Appeal, 3 Barr, 218, the term was construed from the character and subject of the lease. The plaintiff, therefore, on the trial, did not establish the issue on his part, directly, by proof; nor did he establish any facts from which any term for one year could be implied. The court, therefore, erred in deciding otherwise. Proof must correspond with the issue. An allegation that a defendant held premises as tenant for a term of years, or from year to year, is not made out by proof that he held by the quarter: Wilkinson v. Hall, 3 Bing. 506.; 3 Eng. C. L. R. 226. The license, or lease at will, was suspended, and never renewed again by Moore. They also cited Watson v. O'Hern, 6 Watts, 362; Esp. N. P. 460.

*Biddle*, contrà.—Demises of land made without limitation as to time, by old authorities mere estates at will. But estates so precarious, and so generally prejudicial to the interests of agriculture, have long been looked upon with increasing strictness; and it is now clearly settled, that when *the relation of landlord and tenant is created* without any limitation as to time, such tenancy shall be a tenancy from year to year, not determinable at the will of either party, nor even at the end of the current year, without a notice to quit regularly served: 6 Law Lib. 7, 8; Chit. on Con. 319, 320.

Although the statute of frauds enacts, that all leases for more than three years by parol shall have the effect of estates at will, yet such a lease is held to be a tenancy from year to year: 6 Law Lib. 8; Chit. on Con. 319. A *general hiring* of a clerk is construed to be a hiring *for a year*, and from year to year, as the parties respectively please: Chit. on Con. 57, 58.

If a license is granted to a man to use my ground or my yard, he thereby has an interest in it, so that the license is not revocable, but it amounts to a lease at will; and this seemed to be the opinion of the court; and that he thereby had such a possession

as not to be turned out by a revocation, but by an ejectment: 11 Mod. R. 42.

Recognises doctrine in Comyn, and also on the subject of leases implied from a variety of circumstances: Chit. on Con. 257. It is not necessary that money should be reserved; any other thing of which the value may be ascertained, will serve equally well; as upon a demise of lands, a portion of the ore produced: 6 Law Lib. 90, 160. As to uncertainty of rent, see Fry *v.* Jones, 2 Rawle, 12. Here fifty cents a load for the ore taken, can be made certain: Lesley and another *v.* Randolph, 4 Rawle, 126; 3 Wilson, 25; Watson *v.* O'Hern, 6 Watts, 362, 368.

Then in this case Moore agreed that Miller should open the ore-bank and have the ore as long as he pleased at fifty cents, and put up cabins. The rent was certain—by the load fifty cents. If Miller did not work it, Moore had his action, as shown by Watson *v.* O'Hern, bottom of page 369.

As to confirming lease by accepting rent: Chit. on Con. 258–260; Shaw *v.* Turnpike, 3 P. R. 445. If a party to a contract be delinquent, the other party may take advantage of the omission by declaring the contract at an end; but if he treat it as still subsisting, he thereby waives the consequences of such default. A person having exclusive right of digging turves or coals may support *tres. qu. clau. fregit :* 1 Chit. Pl. 175.

*June* 8. COULTER, J.—In estimating the language which constitutes a lease, the form of words used is of no consequence. It is not necessary that the term *lease* should be used. Whatever is equivalent will be equally available. If the words assume the form of a license, covenant, or agreement, and the other requisites of a lease are present, they will be sufficient: Co. Litt. 45 b; Bac. Abr. tit. *Lease*, K.

An agreement that Miller should enter and dig for ore, build houses, &c., he to pay, as a compensation to the owner of the land, fifty cents a ton for every ton of ore, was, in substance and fact, a lease. But whether it was only a tenancy at will, or constituted a lease for a year, was a question of fact to be determined from the evidence; and as the evidence was *in pais*, and the alleged lease by parol, it was a fact properly referable to the jury. If the lease had been in writing, the construction would have been for the court. But there was evidence on both sides in relation to the alleged contract; the court were therefore not bound to take it from the jury. It was their province to instruct the jury what

constituted a lease for a year, and what established only a tenancy at will.

Many questions are so complicated by matters of law and fact closely blended, that they must of necessity be submitted to the jury, the court giving them proper legal instruction.

In answer to the defendant's first point, the court tell the jury that the lease or contract as sworn to by the two witnesses therein named, did not create such a tenancy or term in Miller as Moore could not determine at will; but they added that the jury must determine from the whole testimony in the cause, and in this there was certainly no error. The counsel allege that the answer contained no definite instruction. It was, however, precisely adapted to the question put to the court.

The court affirmed the second proposition of the defendant, which gave this large instruction to the jury—" that in the absence of proof there is no implication arises in the law that the plaintiff below (Miller) was to hold and enjoy the privilege of taking ore for a year—from year to year—or any other determinate period; and in the absence of proof fixing a term or definite period, the plaintiff cannot recover in this action." The court add, " that the answer must have the same qualification as that contained in their answer to the first point of the defendant," that is, that the jury must look for the proof to the whole evidence in the cause. I am unable to perceive any error in this answer. It gives the instruction prayed for; and certainly the jury must regard the whole evidence admitted and received, because that is their sworn duty. The court cannot, by its instructions, withdraw from the jury or limit the determination of facts which are to be ascertained and influenced by other facts proved in the cause: 5 Monroe, 280; 5 Porter, 215.

The court refuse to give the instructions prayed for in the defendant's third point. This was right and proper. There was considerable testimony on both sides, and the defendant in this point prayed the court to instruct the jury, that if they believed the testimony of Hunt and McKinney, and all other testimony in the cause, the plaintiff below could not maintain the action. The point proposed necessarily admits and implies that certain facts are to be proved, and invokes the court to decide not merely on the sufficiency of those facts, but also on all inferences and presumptions which a jury might draw from them. But this is not the province of the court. The leading fact may be presumed or inferred from other facts proved; and that is the province of the jury. Thus it has been ruled, that if the evidence only

shows facts from which the main fact may be inferred or presumed by the jury, the case ought to be left to the jury, with proper legal instructions: Lindsay *v.* Lindsay, 11 Vermont, 621. The main fact here was the period or limitation of the license, agreement, or lease, if any; and that might be inferred or presumed from other facts. There was not only opposing testimony, but in some respects conflicting testimony. In all aspects, therefore, it was proper to submit the case to the jury. We see no error in the instructions which accompanied that submission. The court are not bound to withdraw a case from the jury at the request of either party, when there is anything in it legitimately referable to them. Where the evidence is clearly insufficient, it is not error, however, if the court choose so to instruct them. But by the tenor of our own decided cases, it is error to withdraw a case from the jury when there is any matter which ought to be left to them; and I am quite free to say, that if the court below had given the instruction prayed for on this point, we would have been compelled to reverse the judgment at the instance of the other party, because it would have withdrawn from the jury what he had a right to demand should be decided by them.

The defendant's fourth point is identical in character with the third, inasmuch as it requires the court to decide the cause, and give a binding instruction to the jury, from certain specified evidence, and all the evidence in the cause. This is a case where the evidence was of such a nature as to require its submission to a jury. It had elements in it which ought to be disposed of by them. The court would have been perfectly warranted, therefore, in merely declining to answer affirmatively. But they answer with such qualification and reference to the proof in the cause, as to do justice to both parties. In point of law there is nothing erroneous in the answer.

The fifth point merely iterates the third and fourth, by requiring the court to instruct the jury that the plaintiff had no right to recover, from the evidence. The court thought proper to decline giving the instruction, under the circumstances of the case; and, in this, there was no error.

The court instructs the jury that the defendant's sixth point is true, if they find the facts as stated in it. I cannot perceive why the defendant complained, or that he had any right to complain, of this instruction. The court put the case very fairly to the jury, both in the second and concluding paragraphs of their charge, upon the question whether the plaintiff had proved a lease such as he

alleged in his pleading, to wit, a lease for a year; and as to what constituted such lease or tenure, they instruct the jury in the very language which the defendant requested them to employ. The court seem to have fulfilled all the exigencies of the case, viewing as well the rights of the one party as the other.

Judgment affirmed.