Schuster *v.* Pennsylvania Turnpike Commission, Appellant.

442

Argued January 8, 1959. Before JONES, C. J., MUS-
MANNO, JONES, COHEN and McBRIDE, JJ.

*Joseph P. Kane,* with him *John A. Morano, Hubert
Earle, Prall B. Roads,* Assistant Counsel, and *Henry
Harner,* Chief Counsel, for Pennsylvania Turnpike
Commission, appellant.

*William J. Oliver,* with him *Paul H. Price, J. H.
Oliver,* and *Homanich, Dutka and Yavorek,* for appel-
lees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March
16, 1959:

In this eminent domain proceeding two issues are
presented: (1) were any property rights taken?; (2)
was the jury verdict excessive?

The Pennsylvania Turnpike Commission (herein
called Commission), in connection with the proposed
construction of the Northeast Extension of the Turn-

pike, on January 18, 1954, by an appropriate resolution, condemned certain land located in Lackawanna County for the purpose of a 200 foot wide right of way. The actual construction of a section of the Turnpike across this land did not commence until May 1956. On June 4, 1956 Henry A. Schuster and Pearl E. Schuster (herein called Schusters), claiming certain property rights belonging to them in the land had been "taken" by the commission's condemnation, petitioned the Court of Common Pleas of Lackawanna County for the appointment of a board of viewers which board was duly appointed. The commission then petitioned the court to join as a party in the proceeding one Robert Y. Moffat, trading as Moffat Coal Company (herein called Moffat) alleging that Moffat was the title-holder of the land in question. This petition was refused by the court below.[1]

On February 26, 1957, after hearings, the board of viewers awarded Schusters damages in the amount of $47,652.80. Exceptions filed to this award by both parties were dismissed in a written opinion by President Judge T. LINUS HOBAN. The commission having requested a jury trial, the matter came on for trial before Judge MICHAEL J. EAGEN and a jury and resulted in a verdict in favor of Schusters in the amount of $67,000. From a judgment entered on that verdict the commission took this appeal.

The commission initially contends that the Schusters did not have any property rights or interest in the land which was "taken" by the condemnation. An understanding of the commission's position in this respect requires a review of the factual background surrounding the ownership of the land in question, a background well summarized in the opinion of the court below.

---

[1] Neither the docket entries nor the record disclose any exceptions taken by the commission to this action of the court below. The court's refusal to join Moffat is *not* an issue on this appeal.

"As of December 31, 1938, the complete legal title in fee in the lands involved was in the Glen Alden Coal Company. This included ownership of the surface of the land and everything underneath. On that date, the owner corporation entered into a written contract with Robert Y. Moffat as an individual giving him the right to mine and remove the coal minerals underneath the surface of the land. On December 31, 1941, the rights of Robert Y. Moffat under this contract were assigned in writing to the Continental Archbald Coal Company, a corporation owned and controlled by the Moffat family. On July 1, 1953, the Glen Alden Coal Company conveyed all of its interest in the land (surface and subterranean rights) to Robert Y. Moffat, as an individual.

"In May 1946, Earl Lamb, general manager for all of the Moffat interests, and the plaintiff, Henry A. Schuster, entered into an oral agreement whereby the latter was given the right to enter upon the land, mine and remove the coal underneath for sale purposes; the Moffat interests were given the right to purchase the coal for a stipulated price, if they so wished, otherwise to be paid a tonnage royalty for all coal removed; the area to be mined was limited and defined under the agreement and approximated 65 acres. (While the record fails to show it this type of arrangement for individuals to mine and remove the coal from lands owned by the larger coal companies is typical and frequent in the hard coal fields). The contract could not be cancelled by Moffat before exhaustion of the coal except for good reason and cause. This arrangement between the Moffat interests and the plaintiff was known to the Glen Alden Coal Company and carried on over the years with its tacit approval.

"Shortly after this agreement was reached, the [Schusters] entered upon the land which was then in

a wild and undeveloped state and proceeded to develop a coal mine operation.

"This involved an expenditure of many thousands of dollars in the construction and driving of a slope from the surface to the coal area; the building of several buildings and roadways on the surface necessary to the operation.

"In 1953, after Moffat had gained complete title to the land, the plaintiff, Henry A. Schuster, and Earl Lamb, representing the Moffat interests, had further discussions wherein the previous agreement was affirmed and the [Schusters] urged to carry on their coal mining operation on the property."

Schusters continued their mining operations until the work of construction began. At the time of the condemnation Schusters owned several buildings which were located on the land: a cap house (for the storage of blasting caps used for detonating the dynamite with which the coal was blasted), a steel garage and warehouse, a powderhouse, an oilhouse, a coal pocket and storehouse beneath the structure (for the storage of coal taken from the mines), and a hoisting engine house. The latter was vital to the mining operations in that it housed the hoisting equipment by means of which the coal was haulted in cars up the slope from the underground mine. The coal which Schusters mined was not directly under the surface of the land over which the Turnpike established its right of way but underneath land which immediately adjoined the land taken and, in order to reach and mine this coal, Schusters had driven a slope approximately 1800 feet long. As a result of the Turnpike construction certain buildings were torn down, other buildings were moved to new locations outside the Turnpike right of way, a new road permitting ingress and egress to and from the mining operations was constructed and the entry to the slope

had to be altered and its grade changed from 20°-25° to approximately 30°.

We repeat that the commission, taking the position that Schusters' damages were not compensable, specifically argues that only "land" was "taken" and that Schusters neither owned the land nor had interest whatsoever in the "land" taken.

The commission's power of eminent domain arises from the Pennsylvania Turnpike Northeastern Extension Act.[2] Under this statute the commission is empowered to condemn "any lands, interest in lands, property rights, rights of way, franchises, easements and other property . . ." By its resolution of January 18, 1954 the commission established a Turnpike right of way over the instant land 200 feet in width. By its terms this resolution condemned not only the land covered by the right of way but also "utility rights-of-way, and all lands, rights, easements, franchises and all other property necessary or convenient for the construction or efficient operation and maintenance of the section of the Northeast Extension" of the Turnpike. While the commission argues that it condemned only "land" or an "interest in land", yet it does submit that the "pivotal question" is "whether or not appellees [Schusters] owned land or such interests in land or property rights in land as would entitle them to compensation . . ."

"It is well recognized in Pennsylvania that there may be three estates in land, namely, *coal, surface* and *right of support,* so that one person may own the coal, another the surface, and the third the right of support:" *Smith v. Glen Alden Coal Company et al.,* 347 Pa. 290, 304, 32 A. 2d 227. Insofar as the instant tract of land is concerned, at the time of condemnation the

---

[2] Act of 1951, September 27, P.L. 1430, §8, 36 PS §660.8 et seq.

ownership of all three estates—the coal,[3] the surface and right of support—was in Robert Y. Moffat.[4] Our inquiry is whether, exclusive of Moffat's *ownership*, Schusters had any property right or interest in this tract of land which was directly affected by the commission's condemnation so as to entitle them to compensation.

Schusters rely upon an oral agreement to establish their property rights and interest. While ownership[5] of all three estates in this tract of land prior to July 1, 1953 was in the Glen Alden Coal Company, such ownership was subject to a written lease made in 1938 by Glen Alden to Moffat under the terms of which Moffat was to furnish all labor, materials, tools and equipment, etc., to mine and remove all the coal in portions of certain coal veins for a period of five years and thereafter until terminated by either party giving written notice one year in advance to the other of an intention to terminate. The coal was to be delivered in a run-of-mine (i.e. unprepared) condition to Glen Alden

---

[3] Unless the agreement between Moffat and Schusters be construed as a sale of the coal in place under the 65 acres covered by the agreement.

[4] Moffat, as owner of the coal underneath the Turnpike right of way, had the duty of leaving enough coal thereunder and adjacent thereto so as to afford the highway adequate vertical and lateral support in order to prevent a subsidence. The authority to determine the amount of coal to be left in place and the compensation to be paid therefor is vested exclusively in the State Mining Commission created under the Act of June 1, 1933, P.L. 1409, as amended, 52 PS §1501 et seq. Redress for the taking by the commission of the surface land and all coal not required for support of the highway would be sought before a board of viewers: *Kerry v. Commonwealth*, 381 Pa. 242, 247, 113 A. 2d 254; *Glen Alden Coal Company's Case*, 339 Pa. 149, 14 A. 2d 76; *Glen Alden Coal Company Case*, 350 Pa. 177, 38 A. 2d 37; *Payne Appeal*, 350 Pa. 22, 24, 38 A. 2d 26; *Union Collieries Company Appeal*, 345 Pa. 531, 29 A. 2d 26.

[5] Note 3, supra.

and the lease was not to be sublet or assigned without Glen Alden's written consent.[6] This lease was assigned in 1941 to the Continental Archbald Coal Company[7] by Moffat with Glen Alden's written consent. In 1946 Schusters made an oral agreement with one Earl Lamb, the general manager of all the Moffat interests, including Continental Archbald Coal Company and Moffat, under the terms of which agreement Schusters were granted the right to mine and remove the coal from No. 1 Dunmore vein in an area comprising 65 acres of the entire area embraced in the Glen Alden-Continental Archbald lease. *None of the parties in interest*—Glen Alden, Moffat or Continental Archbald—*ever questioned Lamb's authority to enter into this agreement.* The record clearly indicates that *all* the parties not only knew of and acknowledged the existence of this oral agreement but representatives of *all* the parties checked Schusters' operations regularly and frequently.[8] Glen Alden not only did not question the lease being made without its consent but by its conduct tacitly approved the lease. Schusters, with the knowledge and consent of all parties, continued to operate the mine until July 1, 1953 at which time Moffat became the owner of all Glen Alden's holdings in the area.

Schusters and Lamb—the latter again representing the Moffat interests—in August, 1953 entered into another oral agreement which continued in effect the applicable terms of the original oral agreement between the parties. *It is under this oral agreement of August*

---

[6] As to the validity of such an agreement not to assign: *Morgan v. Phillips*, 385 Pa. 9, 15, 122 A. 2d 73; *Girard Trust Co. v. Cosgrove*, 270 Pa. 570, 572, 113 A. 741.

[7] This corporation was Moffat-owned and Moffat-controlled.

[8] Glen Alden's assistant mining engineer testified that for 2 or 3 years after Schusters began operations he checked the property twice a month and, thereafter, once a month for the purpose of making reports to Glen Alden.

*1953* Schusters were conducting mining operations at the time the commission condemned the land.

After the 1946 agreement Schusters entered upon this land and expended considerable sums of money to enable it to be used as their base of operations from which to mine the coal lying under the land covered by the agreement. The place of entry leading to the situs of the subsurface coal was upon the tract of land condemned by the commission. For approximately 8 years Schusters conducted their mining operations with the knowledge and approval of all parties in interest.

The commission now argues that Schusters' agreement, being oral, violates the statute of frauds,[9] and, even if the statute of frauds is inapplicable, Schusters acquired no property rights nor interest in the land by virtue of the agreement.[10]

In considering the applicability of the statute of frauds we must emphasize the proven fact of record that *all* parties in interest acknowledged, recognized and approved by their conduct and admissions the 1946 and 1953 oral agreements with Schusters. *No one invokes the statute except the commission.*

The statute of frauds is not a rule of evidence, but a declaration of public policy: *Haskell v. Heathcote,* 363 Pa. 184, 188, 69 A. 2d 71; *Brotman v. Brotman,* 353 Pa. 570, 573, 46 A. 2d 175; *Gogel v. Blazofsky,* 187 Pa. Superior Ct. 32, 36, 37, 142 A. 2d 313. This Court, speaking through Mr. Justice (later Chief Justice) HORACE STERN in *Zlotziver v. Zlotziver,* 355 Pa. 299, 302, 49 A. 2d 779, said: "The statute of frauds, however, does not absolutely invalidate an oral contract relating to land but is intended merely to guard against

---

[9] Act of March 21, 1772, 1 Sm. L. 389, §1, 33 PS §1.

[10] The commission's position appears conflicting. Either the oral agreement did or did not deal with an interest in land; if it did not, how could it be within §1 of the statute of frauds?

perjury on the part of one claiming under the alleged agreement. Accordingly, if the title-holder admits, either in his pleadings or his testimony, that he did in fact enter into the contract, the purpose of the statute of frauds is served and the oral agreement will be enforced by the court: [citing cases]." Since the title holder of both surface and mineral rights has never seen fit either to deny the 1953 oral agreement or to invoke the statute but has in fact acknowledged and admitted the existence of this oral agreement, the commission, a stranger to the transaction, should not be permitted to invoke the statute.[11]

The statute is intended to protect the party sought to be charged—in this case, Moffat—and does not make it inherently wrong for a party to enter into an oral contract concerning subject matter coming within the meaning of the statute. "Its [the statute's] benefits cannot be claimed by one who is not a party or privy to the oral contract and is not sought to be charged personally on such contract.": 49 Am. Jur. §589, p. 896; *Christy et al. v. Brien et al.*, 14 Pa. 248; *Houser v. Lamont*, 55 Pa. 311; *Sferra v. Urling et al.*, 328 Pa. 161, 167, 195 A. 422. In the *Sferra* case, supra, (p. 167) the Court said: "The statute of frauds does not absolutely outlaw oral contracts relating to land. It has long been established that a contract within the statute of frauds will be accorded full legal effect *if those who are entitled to the protection of the statute choose to affirm the existence of the contract and recognize it*

[11] Chief Justice GIBSON in *Christy et al. v. Brien et al.*, infra, stated: "Where perjury or fraud is impossible, there is no room for the statute, *if it be not introduced by a party to the contract*, as a specific point of defense" (p. 250). (Emphasis supplied). In *Cole v. Ellwood Power Co.*, 216 Pa. 283, 65 A. 678, the question of the right of the condemnor to invoke the statute was not considered.

*as binding on them.* [Citing cases]." (Emphasis supplied). This principle precludes a condemnor in eminent domain proceedings from asserting the defense of the statute against an oral contract between the land owner and a third person. See: 49 Am. Jur. §597, p. 904.

Assuming, however, *arguendo,* that the commission was in a position to invoke the statute, the facts of record are such that the oral agreement is taken out of the statute. The evidence is clear and overwhelming that Schusters entered into possession of this land, that they remained in possession of the surface of the land for upwards of eight years, that their possession was notorious, exclusive and uninterrupted and that, if the 1953 oral agreement is not recognized, adequate compensation in damages cannot readily be awarded them and an injustice will result. Under the rule of our cases such performance on Schusters' part, *particularly with the recognition and admission by all parties privy thereto of the existence of the agreement,* takes this oral agreement out of the statute of frauds: *Klingensmith v. Klingensmith,* 375 Pa. 178, 181, 183, 100 A. 2d 76; *Martin v. Wilson,* 371 Pa. 529, 534, 92 A. 2d 193; *Suchan et ux. v. Swope et al.,* 357 Pa. 16, 21, 53 A. 2d 116; *Moyer et al. v. Moyer et al.,* 356 Pa. 184, 188, 51 A. 2d 798; *Zlotziver v. Zlotziver,* 355 Pa. 299, 302, 49 A. 2d 779; *Brotman v. Brotman,* 353 Pa. 570, 572, 573, 46 A. 2d 175; *Hart v. Carroll,* 85 Pa. 508, 510.

The commission's reliance on the statute of frauds is in vain. It is not in a position to invoke the statute and, even if it were, the record facts take this oral agreement out of the statute.

The commission next urges that, assuming the validity of the oral agreement, the agreement merely granted a license or tenancy at will to the Schusters

to enter upon the land and, as licensees or tenants at will, they were entitled only to notice to remove from the land and not compensation.[12]

"Property" has been thus defined: "In law it is not the physical material object which constitutes property. The term means something more than the mere thing which a person owns . . . the idea of property springs out of the connection, or control, or interest which, according to law, may be acquired in or over things . . . In modern legal systems, property includes practically all valuable rights, the term being indicative and descriptive of every possible interest which a person can have, in any and every thing that is the subject of ownership by man, including every valuable interest which can be enjoyed as property, and recognized as such, . . . and extending to every species of valuable right or interest in either real or personal property, or in easements, franchises and incorporeal hereditaments . . .": 73 C.J.S., Property, §1(b) pp. 138-140. See: *Zimmerman v. Union Paving Co.*, 335 Pa. 319, 6 A. 2d 901; *Godley v. The City of Phila.*, 7 Phila., 637; Nichols on Eminent Domain, Vol. 2, §5.1[2], p. 4; 18 Am. Jur. §156, p. 786.

It is encumbent upon us to inquire into the nature of the property rights or interest in this land, if any, possessed by Schusters. *The source of such right is not the 1946 agreement between Lamb and Schusters, but the 1953 agreement;* the former was simply incorporated into the latter insofar as its terms were applicable, while the latter established Schusters' rights as they existed at the time of the condemnation. The owner of the coal—Moffat—through his authorized agent gave Schusters the right to mine all the coal to

---

[12] The commission's suggestion that Schusters might be considered Moffat's employees finds no support in the record, in reason or in the law.

exhaustion in a certain vein under a 65 acre tract of land. While nothing was *expressly* stated in the oral agreement, by *implication* Moffat thus gave Schusters the use of the surface of such tract of land to the extent that such use was necessary to carry on and accomplish the work of mining and extracting coal from beneath the surface of such land. Such a principle has been long recognized in Pennsylvania. In 1854 in *Turner v. Reynolds*, 23 Pa. 199, 206, this Court said: "One who has the exclusive right to mine coal upon a tract of land has the right of possession even as against the owner of the soil, so far as it is necessary to carry on his mining operations . . . As against an intruder . . . we will presume that the possession of the soil was requisite, in order to enable the plaintiffs to avail themselves of their mining privileges". To the same effect: *Trout v. McDonald*, 83 Pa. 144, 146; *Chartiers Block Coal Co. v. Mellon*, 152 Pa. 286, 296, 25 A. 597; *Baker v. Pittsburgh, Carnegie & Western Railroad Company*, 219 Pa. 398, 403, 68 A. 1014; *Oberly et al. v. H. C. Frick Coke Company,* 262 Pa. 83, 86, 87, 88, 89, 104 A. 864; *Friedline v. Hoffman et al.*, 271 Pa. 530, 534, 535, 115 A. 845; *Dougherty et al. v. Thomas, Executor*, 313 Pa. 287, 295, 296, 169 A. 219.[13] Schusters acquired by the

---

[13] "A grant of minerals implies the right to win them from the underlying soil. The use of some portion of the surface is necessary for the proper enjoyment of this right. To reach the minerals the miner must pass from the surface downward; to do this he has a right of way of necessity. He may sink through such land from the surface to the mines, in order to reach and work them": 2 Lindley on Mines, §813; 2 Sugdon on Mines and Mining, §1008; "The Law of Mines and Mining", Barringer & Adams, (1897 Ed.) p. 576. This principle is inapplicable if the coal to be removed is under land not covered by the agreement, i.e. adjoining land: *Weisfield v. Beale,* 231 Pa. 39, 79 A. 878; *Webber v. Vogel*, 159 Pa. 235, 28 A. 226, subsequent appeal in 189 Pa. 156, 42 A. 4; *McCloskey v. Miller,* 72 Pa. 151; 48 A.L.R. 1406 et seq.

agreement the right not only to mine the coal under this land but the right to the use of so much of the surface of the land as was necessary to the conduct of their mining operations. The commission does not claim that the extent of the surface of this tract of land actually occupied by the buildings, etc. of Schusters was not necessary to the mining operations; on the contrary it will be presumed as against the commission, a stranger to the agreement, that such use as exercised was necessary. Schusters' right was not only a "property right" but an "interest in the land".

The commission's contention that Schusters were either licensees or tenants at will,—capacities in which they could make no claim for compensation,—is without merit. If Schusters were parol licensees certainly the expenditure of large sums of money by them in reliance on the parol agreement, as shown by this record, would make irrevocable their license and give the oral agreement the status of a binding contract. In *Cole v. Ellwood Power Company*, 216 Pa. 283, 65 A. 678, this Court recognized that an oral lease of a quarry conferred upon the lessee a property right for the loss of which he was entitled to damages in a condemnation proceeding, stating: "In these cases [referring to cases already cited] the rule is recognized that if a license, or privilege, to do something on the land of the licensor, is given by parol, then followed by the expenditure of money, on the faith of the parol agreement, it is irrevocable and is to be treated as a binding contract. Equity treats the license thus executed as a contract giving absolute rights, and protects the licensee in the enjoyment of those rights" (p. 289). If Schusters were licensees they possessed an irrevocable license with all the rights thereby conferred.

Facts of record as well as the law make clear that Schusters were not tenants at will. The testimony is

uncontradicted that Schusters were given the right to mine the coal under this land until its exhaustion and the only ground upon which such right could be cancelled was "for good cause" which meant a failure on the part of Schusters to perform the mining in a proper and workmanlike manner. If such was the understanding of the parties, Schusters had more than a lease of the coal because as was said in *Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 298, 32 A. 2d 227: "It is settled in this State that a lease of coal in place, such as this is, 'until such time as all the available merchantable coal shall have been mined and removed', *is a sale of an estate in fee simple* and leaves the lessor with only an interest in the royalties to be paid him under that lease. [citing cases."] [14]  See also: *Delaware, Lackawanna and Western Railroad Company v. Sanderson,* 109 Pa. 583, 1 A. 394; *Sturdevant v. Thomson,* 280 Pa. 233, 124 A. 434; *Westbrook Coal Company v. Hudson Coal Co.,* 352 Pa. 371, 42 A. 2d 825; *Com. v. Solley,* 384 Pa. 404, 121 A. 2d 169; *Boron v. Smith,* 380 Pa. 98, 110 A. 169; *City of Pittsburgh v. Pa. P.U.C.,* 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607. As Mr. Justice BELL, speaking for the Court, in *Shenandoah Borough v. Philadelphia,* 367 Pa. 180, 186, 79 A. 2d 433, stated: "Nevertheless the law is long and well settled in Pennsylvania that 'The grant of a right to mine coal

---

[14] See however as to the lessor's right of reversion: *London v. Kingsley,* 368 Pa. 109, 119, 120, 81 A. 2d 870; *In re Petition of Namura,* 41 Luz. L. R. 125. That a coal lease may grant an estate in fee in the coal in place does not mean that the fee granted is absolute; *City of Pittsburgh v. Pa. P.U.C.,* 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607; *Third National Bank & Trust Company of Scranton v. Lehigh Valley Coal Co.,* 353 Pa. 185, 44 A. 2d 571, (lessor's right of re-entry if lessee violates covenants in lease) ; *Davis v. Moss,* 38 Pa. 346 (if lessee abandons the property) ; *Penrose et al. v. Coal Co. et al.,* 289 Pa. 519, 137 A. 670 (if lessee fails to exercise due diligence in developing the mine).

in the lands of the lessor and remove it therefrom, although the instrument may be called a lease, is a grant of an interest in the land itself, and not a mere license to take the coal' . . ." The instant oral understanding of the parties did not create a tenancy at will for Moffat could not terminate the rights granted to Schusters unless and until the latter failed to perform their obligations in a proper and workmanlike manner or the term ended.

We need not nor do we decide whether this oral understanding between the parties created a lease[15] or a sale of the coal in place; we need only determine whether Schusters acquired thereunder property rights or an interest in the land which was taken by condemnation. The commission argues, in effect, that, unless a name can be given to Schusters' rights, they are not property rights. The vice of this argument was indicated by Mr. Justice SIMPSON in *Hall et al. v. Delaware, Lackawanna and Western R.R. Co.*, 270 Pa. 468, 471, 113 A. 669: "The vital thing, however, is not the name given to the estate acquired by the railroad company (for applying an old name to that which is sui generis, is apt to be followed by attempts to give all the attributes, usually applicable to the old title, to the new creation to which they do not belong), but what are the' rights acquired by reason of the taking?"

What rights of Schusters were affected by this condemnation? The right to the use of the surface of the tract over which the Turnpike is now located for buildings and sheds necessary for the storage of materials and equipment essential to the mining, the right to the use of the slope at the place on the surface and at the grade at which the hoisting equipment could be most efficiently and practically operated, the right to conduct

---

[15] *Moore v. Miller*, 8 Pa. 272, 283; *Wallace v. Dorris*, 218 Pa. 534, 541, 67 A. 858.

its mining operations on the surface of the land, the right to the use of the surface of this tract of land, *impliedly,* if not *expressly,* granted, as a necessary corollary to the expressly granted right of extraction of the coal from beneath the tract—these rights have been directly affected by the condemnation for Turnpike purposes. As a result of the taking, certain of the buildings had to be removed, the coal tipple removed and reconstructed at another site, the grade of the slope changed, a new access highway constructed—all in order that Schusters could continue to operate and mine coal.

By its condemnation of this tract of land valuable property rights of Schusters have been directly taken; for such taking they are entitled to fair compensation.

Lastly, the commission argues that the jury verdict of $67,000 was excessive, particularly since the award of the board of viewers was $47,652.80. While disparity between the award of a board of viewers and the verdict of a jury is an important circumstance to be considered (*Young v. Upper Yoder Township School District,* 383 Pa. 320, 325, 118 A. 2d 440), it is in no sense controlling.

Rather than being shocked at the amount of this verdict, an examination of the record convinces us of its propriety. The testimony of two mining experts, Kudlich and Steele, called by Schusters, evaluated Schusters' damages much higher than the verdict; Kudlich placed the damages at $95,000 and Steele at $105,-000. The commission, apparently believing that damages should be restricted to the depreciation of two small buildings, offered no testimony in contradiction of Schusters' witnesses testimony on the subject.

The verdict and its amount were clearly justified by the evidence and should not be disturbed.

Judgment affirmed.

Mr. Justice COHEN dissents.