## Petition of Southgate Shopping Center, Inc.

*Leonard M. Mendelson,* for condemnee.

*Fred J. Garrett,* Assistant Attorney General, and *Davis G. Yohe,* for Commonwealth.

McCUNE, J., January 6, 1967.—The Commonwealth has taken an appeal from a viewers' award in the above captioned case. The appeal is filed under section 515 of the Eminent Domain Code of June 22, 1964, P. L. 84, which permits raising objections of law or fact as well as a request for jury trial. A jury trial has been requested, and one will follow as a matter of course.

There are three questions, however, which have been raised by the appeal. They relate to matters which the viewers considered in making their award which, according to the Commonwealth, should not have been considered. These are really objections, therefore, to be dealt with under section 517 of the code, which states that all objections, other than the amount of the award, raised by the appeal shall be determined by the court preliminarily. We are, in effect, deciding in ad-

vance of a jury trial whether a jury will be allowed to consider the same things the viewers elected to consider. We have the additional duty of deciding whether to return the case to the viewers for further consideration or whether to allow it to proceed.

The first question is whether the viewers were correct in assessing against the Commonwealth the cost incurred by plaintiffs in having a composite map prepared for use at the viewers' hearing. The amount involved is $276. The first petition for the appointment of viewers was filed by the Commonwealth, to which there were attached the usual prints showing the taking in red for highway construction through the tract of plaintiffs. Plaintiffs then filed their own petition (perhaps without knowledge of the one already filed), and the two were consolidated and heard as one. Plaintiffs' counsel felt the need of a more complete plan and procured one from an engineer of his own choice which, in some respects, was more satisfactory and particularly showed the complete perimeter of the properties in dispute. As nearly as we can ascertain, plaintiffs' counsel did not ask the Commonwealth for more complete maps or plans; nor did the viewers. The viewers did use plaintiffs' plan, which was labelled "Viewers' Plan". No one asked the court to approve the expense involved in acquiring the plan.

Section 509 of the code, which governs, states that condemnor shall furnish the viewers at or before the view with a plan showing the entire property involved, the improvements thereon, the extent and nature of the condemnation and such other physical data, including grades, as may be necessary for the proper determination of just compensation. If, in the opinion of the viewers, the plans are insufficient, they may require the submission of supplemental plans. Copies of the plans shall be furnished at the same time, without cost, to condemnee upon written request. If condem-

nor does not furnish a plan, or condemnor's plans are insufficient, the court, *on application of condemnee,* may tax to condemnor as costs reasonable expenses for plans furnished by condemnee.

The comments under this section state that it is contemplated that the court, upon petition, will permit condemnee to have plans made and charged to condemnor if condemnee neglects to furnish proper plans: Rush v. Allegheny County, 159 Pa. Superior Ct. 163 (1946).

In our judgment, the costs of plaintiffs' plans cannot be assessed to condemnor. Plaintiff was obligated to petition the court for approval before having his own plans drafted if he intended to charge the Commonwealth for them.

The second objection is more serious. Plaintiff contends that the tract affected by the taking was composed of two parcels: "A", which was a tract of 83.791 acres owned by the Falconi brothers at the time of taking, and "B", which was a tract of 6.299 acres owned by Harry Deaktor at the time of taking on *August 1, 1958.* Plaintiffs' petition was filed on behalf of Southgate Shopping Center, Inc., alleged to be the equitable owner of both parcels. The Commonwealth admits, we take it, that Southgate had equitable title to parcel "A" and, in fact, the deed to Southgate from the Falconis assigns condemnation damages to Southgate, but the Commonwealth contends that at the time of condemnation, Southgate had no equitable interest in parcel "B" but, in fact, it was Harry Deaktor's land and, although it now belongs to Southgate, it must be valued separately. The Commonwealth contends, and plaintiffs admit, that the parcels treated separately are less valuable than the tract treated as a whole.

It is admitted that if Southgate really had a property interest in both parcels, the viewers were correct in treating them as one tract.

The evidence produced, which tended to show that Southgate was the real party in interest as to both parcels, was as follows:

Southgate was incorporated July 16, 1958 (prior to the condemnation). Falconis gave an option on parcel "A" to Perry Lane July 12, 1957. Perry Lane and Harry Deaktor agreed in writing on September 24, 1957, to develop the two tracts as a shopping center. (Although this agreement was supposed to have been made a part of the record as Exhibit "A", we cannot find it and are thus handicapped because we cannot ascertain its content.) Deaktor took title to parcel "B" October 10, 1957.

Falconis deeded parcel "A" to Southgate August 28, 1958, and Perry Lane assigned his interest under the option to Southgate in parcel "A" on August 25, 1958.

Deaktor conveyed parcel "B" to Southgate July 3, 1959, and in the deed said he was a straw man for Southgate and held title for Southgate. He did not assign condemnation damages, but he testified on behalf of Southgate and stated he intends Southgate to have the damages.

Both Lane and Deaktor say they have always held title for Southgate and not individually, that they had planned the shopping center before the date of their agreement in 1957, and that they have never had an interest in the land as individuals. They state they have always planned to develop the parcels together as one tract. They both are now officers of Southgate.

The Commonwealth contends that the part of the testimony which is not supported by writing is self serving and violates the statute of frauds. Of course, no one invokes the statute of frauds except the Commonwealth.

In our judgment, the Commonwealth may well be faced with the necessity of treating the parcels as one tract, because the owners of record say they held the

parcels in trust for Southgate, the real owner, and the Commonwealth cannot invoke the statute of frauds. In Schuster v. Pennsylvania Turnpike Commission, 395 Pa. 441 (1959), a plaintiff in condemnation asserted a property interest in coal and the right to mine it based on an oral agreement, and the Turnpike Commission invoked the statute of frauds. The Supreme Court held that it could not be invoked by the commission and held that the oral agreement gave plaintiff property rights which had been condemned and which were compensable. The court stated the following:

" '[I]f the title holder admits either in his pleadings or his testimony, that he did in fact enter into the contract, the purpose of the statute of frauds is served and the oral agreement will be enforced by the court.' Since the title holder of both surface and mineral rights has never seen fit either to deny the . . . oral agreement or to invoke the statute but has in fact acknowledged and admitted the existence of [the] oral agreement, the commission, a stranger to the transaction, should not be permitted to invoke the statute".

In the case at bar, everyone concerned with the property affirms that both parcels were held for Southgate, a corporation already in existence when the condemnation took place. Apparently, this is true because the self-styled straw men conveyed to Southgate, and they had an agreement in writing that they would develop the property as a shopping center. At least this evidence is admissible.

We believe the viewers were entitled to treat the tract as composed of both parcels if they believed the testimony.

The third objection is that the viewers received evidence of the substantial cost of draining the tract after it had been cut in two by the interstate road built upon it. The construction drained water onto the

lower and smaller portion of the tract. The drainage installed by the owner, Southgate (after it had acquired title), was designed to prepare the land so that it could be used for commercial purposes, i. e., a shopping center, whereas it could have been drained at less cost if it was merely to be used for residences or farming or some less important purpose.

The Commonwealth objects to the viewers receiving and considering such evidence because it contends there is no proof that the land was to be used for a shopping center or for any commercial purposes.

A contractor testified he had already installed $38,-084.95 worth of drainage facilities, and perhaps up to $30,000 more would be required to drain the land so that it would be suitable for commercial use. The viewers, as one of their findings, found that plaintiffs were required to spend the sum of $38,084.95, and will be required to expend additional money. In reviewing the testimony, the viewers found that the real estate expert for plaintiffs stated that the property was in a commercial area and its best use was for commercial purposes and zoning permitted such use. This was true because the expert for plaintiffs assigned the highest and best use as that for a community shopping center. The viewers also examined the land and the location of it.

They had the duty of determining whom they would believe as well as determining the highest and best use. They also listened to considerable testimony about the efforts to establish a shopping center on the land prior to condemnation.

Section 705(2)(v) of the code permits experts to testify concerning the costs of adjustments and alterations to remaining property made necessary or reasonable required by the condemnation. This is in accord with the law prior to the code. In Puloka v. Commonwealth, 323 Pa. 36 (1936), the court held that

estimates of the cost of rebuilding specific items of property are not recoverable as distinct items of damages, but are useful as bearing on the market value.

It is apparent that the viewers accepted the view that the highest and best use of the land drained was commercial use and that the drainage was necessary. They considered it as an element of the damages. They awarded $84,565.70 in damages and $31,901.41 in detention.

How can we disagree with them? Only by accepting the view of the expert for the Commonwealth that the highest and best use for this land was residential land. However, we did not see the land or hear the experts. It is true that the drainage is more extensive than would be required for a residential development, but we have no evidence upon which to overrule the viewers who have used their discretion.

Rather than remanding the case to the viewers so that they might hear an expert for the Commonwealth who has appraised the parcels as one tract, we think it better to list the case for trial so that a jury may pass upon it.

The cost of the plans will be omitted as an element of damages in such trial.

The evidence may be received which tends to prove that the parcels should be treated as one tract. Evidence to the contrary may also be received.

The drainage cost may be considered under proper rulings if the evidence in court is the same as that before the viewers, and provided proper foundations are laid for receiving such evidence. Rulings on evidence will be made by the court as the case progresses.

### ORDER

And now, January 6, 1967, the within case is listed for trial at the next term of court on the special list of Commonwealth cases.